**Martin H. MILLER, Plaintiff,**

**v.**

**Ronald G. HELLER; Cluett Peabody & Co., Inc., Harris P. Hester; West Point-Pepperell; Cluett Peabody's Compensation Committee; and Patrick Walsh, Defendants.**

**Steven J. LOWENTHAL, Plaintiff,**

**v.**

**Ronald G. HELLER; Cluett Peabody & Co., Inc., Harris P. Hester; West Point-Pepperell; Cluett Peabody's Compensation Committee; and Patrick Walsh, Defendants.**

**Nos. 90 Civ. 3763, 90 Civ. 4718.**

United States District Court, S.D. New York.

Feb. 14, 1996.

Bernice K. Leber, Epstein Becker & Green, P.C., New York City, for Plaintiffs.

Michael A. Kalish, Winthrop, Stimson, Putnam & Robert, New York City, for Defendants.

*OPINION*

COTE, District Judge:

Plaintiffs filed these actions in 1990 seeking to recover from defendants monies allegedly due under deferred compensation plans entered into by the plaintiffs during their employment at Cluett Peabody & Co, Inc. ("Cluett").[1] The claims are based on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1145, and common law. On March 13, 1995, the Court issued an Order granting in part defendants' motion for summary judgment, ruling that the plans at issue were ERISA plans, and

1. The two actions have been consolidated for discovery purposes. In addition, the plans at issue are identical, and thus there are numerous legal and factual questions that are the same in both actions. Accordingly, both the parties and the Court have addressed these issues jointly as they apply to both actions.

dismissing plaintiffs' claims based on the common law, their claims for punitive damages, and their claims against the defendants other than Cluett and West Point-Pepperell, Inc. ("WPP"). Currently before the Court are cross motions for summary judgment that raise only the question of whether the deferred compensation plans at issue are funded or unfunded plans under ERISA, which in turn determines whether the plans qualify for certain exemptions from the requirements of ERISA.[2] In this case, the defendants had purchased life insurance policies to recover the costs of paying retirement benefits. For the reasons set forth below, the Court finds that the retirement plans at issue are unfunded.

## SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In making this judgment, the burden is on the moving party, and all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). This Rule does not, however, place a burden on the moving party to come forth with affirmative evidence. As stated in *Lujan v. National Wildlife Federation*,

> Rule 56 does not require the moving party to negate the elements of the nonmoving party's case; to the contrary, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."

497 U.S. 871, 885, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53). When the moving party has asserted facts which demonstrate that plaintiff's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). Thus, in determining whether to grant summary judgment, this Court must (i) determine whether a factual dispute exists based on evidence in the record, and (ii) determine, based on the substantive law at issue, whether the fact in dispute is material.

## BACKGROUND

The sole issue before the Court is whether the Executive Permanent Insurance Program ("EPI") provided by Cluett to plaintiffs, each of whom is a former high-level executive with Cluett, constitutes a "top hat" plan under ERISA. Top hat plans are those plans that are "unfunded and … maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). These plans are exempt from a number of ERISA's requirements, including the portions of the statute dealing with participation and vesting, funding, and fiduciary responsibilities. Instead, the plans are subject solely to the reporting, disclosure, administration, and enforcement portions of ERISA. *See id.; Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923, 930–31 (3d Cir.1985), *overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir.1993).[3]

2. After the Court issued its prior opinion, the Court discussed with the parties the issue of whether resolution of the question of funding would require a trial or whether the issue could be resolved through additional submissions of the parties. In their submissions, both parties contend that no additional information beyond that contained in the papers submitted is necessary for resolution of this issue. Of course, each party presses that the evidence will lead the Court to diametrically opposite findings.

3. The Department of Labor notes that in exempting top hat plans from certain ERISA requirements,

In the 1970s, both plaintiffs joined Cluett's EPI. This plan was restated in 1984. The plan itself contains two components, the life insurance plan and the deferred compensation plan, each of which is set forth in a separate agreement. Specifically at issue in this litigation is the deferred compensation plan and whether it is "unfunded" for purposes of ERISA. The defendants emphasize in their argument that the deferred compensation plan is unfunded because the language of that plan states that the rights of any executives participating in the plan are those of unsecured creditors and that no assets held by Cluett are held in trust to fund the plan. The plaintiffs, however, rely on the life insurance plan to support their claim that the deferred compensation plan is funded. The plaintiffs argue that they are the owners of the life insurance plan, which is a funded plan, and the assets in the life insurance plan are intended to fund the deferred compensation plan, thus making that plan also a funded plan. Because plaintiffs look to the life insurance plan in support of their claim that the deferred compensation plan is funded, the Court will briefly address an issue not raised by the parties, that is, whether there is a single ERISA plan or two separate ERISA plans.

Under ERISA, there are two types of plans, employee welfare benefit plans and employee pension benefit plans. Section 1002(1) of ERISA defines welfare plans to include plans that are established for the purpose of providing, among other things, benefits in the event of death or disability. *See* 29 U.S.C. § 1002(1). In contrast, Section 1002(2)(A) defines pension plans as those programs that either (1) provide retirement income, or (2) result in a deferral of income for periods extending beyond the termination of employment. *Id.* § 1002(2)(A). Based on these definitions, the life insurance agreement would constitute a welfare plan while the deferred compensation agreement would constitute a pension plan. Because the plans are of different types and because the two agreements do not refer to each other in any manner, the agreements must be treated as two separate ERISA plans for the purpose of determining whether the deferred compensation plan is funded or unfunded.

### 1. The Life Insurance Plan

The basic goal of the life insurance plan is to provide the executive with life insurance equal to five times the executive's annual salary at no net cost to Cluett. Although the goal of the policy is simple, the plan itself is somewhat complex. First, although under the insurance agreement the executive is technically the owner of the policy,[4] the incidents of ownership do not lie solely with the plaintiffs. The policy's cumulative cash value,[5] being greater than the life insurance component, is split between plaintiffs and Cluett. Although the plan provides the executive with life insurance equal to five times the executive's salary, the plan's face value is significantly higher than this amount. Based on an actuarial analysis, it is the intention that the difference will provide sufficient funds to finance the executive's death benefit, repay Cluett for its investment in the policy (including interest), and permit Cluett to recoup the cost of providing the deferred compensation outlined below. Further, although Cluett is responsible for paying the premiums, plaintiffs are obligated to repay Cluett the premiums which Cluett has paid on behalf of the plaintiffs (except for that portion already withheld from plaintiffs by Cluett that is sufficient to offset all taxable income deemed received by the executive under the

> Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I [of ERISA].

Op.Dep't Labor 90-14 A, 1990 WL 123933, at *1, 1990 ERISA LEXIS 12, at *3-*4 (May 8, 1990).

4. The life insurance policy provides:

> The Executive shall be the owner of the Policy and he may exercise all the rights of ownership with respect to the Policy except as otherwise hereinafter provided. The Execution shall be the owner of the cash value of the Policy only to the extent of the Executive's Cash Value.

5. This amount includes the cash value of the policy plus additional paid-up insurance purchased with declared dividends on the policy.

tax laws),[6] as well as Cluett's interest in the cash value of the policy. Repayment is secured by the collateral assignment discussed below.

The split nature of the policy's ownership is also demonstrated by the fact that the policy provides for split beneficiaries. The executive has the right to designate a beneficiary for an amount equal to five times the executive's annual salary; Cluett has the right to designate a beneficiary for the remainder of the policy value. In addition to providing for life insurance, the policy provides that both Cluett and the executive may borrow against the policy amounts not in excess of their respective cash values in the policy.

The life insurance agreement terminates upon the occurrence of one of five events: (1) termination of the agreement by either party on thirty-days notice; (2) termination of the executive from employment with Cluett unless due to a disability that occurs prior to the executive's reaching 55 years of age or due to the executive's normal retirement; (3) the executive's reaching 65 years of age; (4) bankruptcy, receivership, or dissolution of Cluett; or (5) at the option of the non-breaching party, if the other party fails to pay premiums as required by the agreement.[7] Upon termination of the agreement, Cluett is entitled to receive ownership of that portion of the policy equal to Cluett's cash value as of the date of the termination. According to the agreement, Cluett's portion "may be the entire policy." In order to achieve this, Cluett may enter into such agreements with the insurance company as are necessary to partition the policy.

In conjunction with the insurance agreement, and as a form of collateral security for any of plaintiffs' liabilities to Cluett under the agreement, the plaintiffs executed assignments of the life insurance policies. These assignments expressly provide Cluett with the sole rights, *inter alia*, to surrender the policy and collect the net proceeds from the insurer. In addition, Cluett is assigned the "right to obtain one or more loans or advances on the policy." Cluett has the right to reassign its rights in the policy as security for the repayment of such loans. These rights are limited, however, such that Cluett

> will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed ... to the undersigned ... notice of intention to exercise such right.

Finally, the assignment provides that

> [i]n the event of any conflict between the provisions of this assignment and the provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail.

### 2. The Deferred Compensation Plan

The second agreement entered into between Cluett and the plaintiffs was the deferred compensation agreement. This agreement provides for receipt by the executives of benefits for the rest of their lives equal to, at a maximum, 30 percent of their highest annual salary, plus benefits to a designated beneficiary for the remainder of the beneficiary's life equal to 15 percent of the executive's maximum annual salary (as adjusted by various factors). In addition, the plan provides for a vesting period and provides no benefits if the executive dies prior to the date payments are to begin. The agreement also includes a no-compete clause that permits Cluett to terminate the agreement if the executive enters a business within three years of leaving Cluett that competes with any business that the executive managed while at Cluett.

6. Notably, the amount withheld, which represents plaintiffs' annual economic benefit resulting from Cluett's payment of the premiums, is based on a face amount of the policy equal to five times the plaintiffs' respective annual salaries and without regard to the policy's cumulative cash value.

7. With regard to the first two categories, if such termination occurs after five years of the policy's effective date (March 1, 1978), the executive may nullify Cluett's termination of the agreement and instead choose to keep the agreement in force by paying his portion of the premiums.

Unlike the insurance agreement, the compensation agreement does not provide a specific funding mechanism for the benefits. To the contrary, the agreement states:

> The rights of the Executive to the Deferred Compensation and of the Beneficiary ... shall be solely those of unsecured creditors of Cluett. No assets acquired or held by Cluett, whether or not in connection with the obligations assumed by it hereunder, shall be deemed to be held under any trust for the benefit of the Executive or the Beneficiary or to be security for the performance of the obligations of Cluett, but shall be and remain a general, unpledged, and unrestricted assets [sic] of Cluett.
>
> The right of the Executive to the payment of the Deferred Compensation and of the Beneficiary ... shall not be assigned, transferred, pledged or encumbered.

It is this language on which Cluett relies in asserting that the deferred compensation plan is unfunded. In contrast, plaintiffs rely on a six-factor test set out in a United States Department of Labor Opinion Letter discussing plan "assets" and the terms of the life insurance agreement to support their claim that the compensation plan is funded. Plaintiffs also argue that the disclaimer in the second sentence quoted above cannot be read to refer to the life insurance agreement since they, not Cluett, are the owners of the life insurance policies.

## LAW

ERISA does not define what makes a plan "funded" for the purpose of determining whether the plan qualifies as a top hat plan. Nonetheless, the Court has two sources to which it may look for guidance in determining whether the plan in this case is funded: the limited case law addressing the question and Opinion Letters issued by the Department of Labor.

The seminal case regarding the question of funding is *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).[8] *Dependahl* involved a welfare benefits plan that provided life insurance to a designated beneficiary for select employees. Under the plan in *Dependahl,* as in the life insurance plan provided by Cluett, the insurance policy was of an amount sufficient to provide both the promised benefits to the employee's beneficiary and to provide funds for the employer to recoup its cost of purchasing the life insurance. Because the insurance policy purchased by the company was owned by the employee and included a beneficiary named by the employee, and because the policy was a whole life policy that had a cash value at any given time, the Court determined that the welfare benefit plan was funded. As the Court stated,

> *[f]unding implies the existence of a res separate from the ordinary assets of the corporation.* All whole-life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans. *The employee may look to a res separate from the corporation* in the event the contingency occurs which triggers the liability of the plan.

*Id.* at 1214 (emphasis supplied). This concept of a separate res has been the focus of subsequent decisions.

In contrast to *Dependahl,* in *Belsky v. First National Life Insurance Co.,* 818 F.2d 661 (8th Cir.1987), the Eighth Circuit found a salary continuance agreement intended to provide retirement, disability and death benefits to constitute an unfunded excess benefit plan. To finance the plan, First National purchased a life insurance policy that would accrue a cash surrender value. This cash surrender value would then provide First National with sufficient funds to pay the

8. *Dependahl* involved an excess benefit plan rather than a top hat plan. Excess benefit plans are defined in ERISA as plans

> maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of the Code [29 U.S.C. § 1002(36)] on plans to which that section applies, without regard to whether the plan is funded.

29 U.S.C. § 1002(36). The Department of Labor has treated the issue of funding the same in both top hat and excess benefit plans. *See, e.g.,* Op. Dep't Labor (No Number in Original), 1992 ERISA LEXIS 44 (Oct. 20, 1992) ("Central Fidelity Banks Opinion").

benefits under the plan. Unlike *Dependahl,* however, the employee had no rights to the funds made available through the purchase of the insurance policy. First National not only paid the premiums on the policy but also was the owner and beneficiary under the policy. In addition, the salary continuance agreement did not mandate that the Bank would set aside any specific assets to fund the plan. Although the Bank in fact had purchased the insurance policy for the purposes of funding any liabilities arising from the plan, the *Belsky* Court focused instead on the language of the plan, which "specifically avoids making a direct tie between the insurance policy and the Plan." *Belsky,* 818 F.2d at 663. In this regard, it was "particularly significant" to the *Belsky* Court that the plan expressly provided,

> "*The rights of the Executive or any beneficiary of the Executive shall be solely those of an unsecured creditor of the Bank.* If the Bank shall acquire an insurance policy or any other asset in connection with the liabilities assumed by it hereunder, then, except as otherwise provided, *such policy or other asset shall not be deemed* to be held under any trust for the benefit of the Executive or his/her beneficiary or *to be collateral security* for the performance of the obligations of the Bank, but *shall be, and remain, a general unpledged, unrestricted asset of the Bank.*"

*Belsky,* 818 F.2d at 663 (quoting agreement) (emphasis supplied). Thus, the *Belsky* Court concluded that instead of providing the employee with any rights in the insurance policy,

> the cash value of the policy simply became *a general, unpledged, unrestricted asset* of the Bank and those Bank assets in turn would be used to fund Belsky's plan.

*Id.* at 663–64 (emphasis supplied). Citing the District Court's opinion in *Dependahl,* the *Belsky* Court further noted that

> a plan is funded when benefits are paid through a specific insurance policy and unfunded when they are paid from the employer's general assets.

*Id.* at 663 (citing *Dependahl v. Falstaff Brewing Corp.,* 491 F.Supp. 1188, 1195 (E.D.Mo. 1980), *aff'd in relevant part,* 653 F.2d 1208 (8th Cir.1981)).

In addition to the distinctions noted above, the Court in *Belsky* went on to describe additional factors that were significant in distinguishing the plan provided by First National from that provided by Falstaff in *Dependahl.* Unlike First National, Falstaff specifically provided in its plan that it had secured its obligations by purchasing life insurance and did not reserve the right to treat this insurance policy as a general unrestricted asset. *Id.* at 664.

Relying on *Belsky* and *Dependahl,* the Court in *Darden v. Nationwide Mutual Insurance Co.,* 717 F.Supp. 388 (E.D.N.C.1989), *aff'd,* 922 F.2d 203 (4th Cir.), *cert. denied,* 502 U.S. 906, 112 S.Ct. 295, 116 L.Ed.2d 240 (1991), found a pension plan to be unfunded. To finance the plan, the defendant had opened a special account entitled an "accumulation fund." Funds from this account were used to purchase annuities that in turn paid the pension benefits. *Id.* at 394. The funds in the account were unrestricted, however, in that the defendant would deposit or withdraw amounts from the account at any time for general corporate purposes. *Id.* at 395. In finding the plan to be unfunded, the Court noted that, notwithstanding the existence of a separate account, the defendant was not required under the plan to acquire specific assets to finance the deferred compensation liabilities. *Id.*

The case most closely analogous to this action is *Northwestern Mutual Life Insurance Co. v. Resolution Trust Corp.,* 848 F.Supp. 1515 (N.D.Ala.1994). As in this case, the defendant had purchased life insurance policies to recoup its costs of paying retirement benefits. The Court in *Northwestern* first addressed the question of whether insurance policies purchased by the employer in conjunction with a deferred compensation plan resulted in the plan being funded. In this regard, the Court wrote:

> [t]he essential feature of a funded plan is that its assets are segregated from the general assets of the employer and are *not available to general creditors if the employer becomes insolvent.*

*Id.* at 1517 (emphasis supplied). Although the employer in *Northwestern* had purchased the insurance policies in the context of providing deferred compensation, the employees could not look to those policies or to any other specific res to pay their retirement benefits. As in *Belsky,* the plan provided that the insurance policy would remain a general unpledged asset of the employer.

In addition to the limited case law addressing the question of funding, the Department of Labor has addressed the question in a number of Opinion Letters. According to the Department of Labor,

> any determination of the "unfunded" status of a "top hat" or "excess benefit" plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law.

Central Fidelity Banks Op., 1992 ERISA LEXIS 44, at *6. The Department of Labor has applied this standard when the employer has created a "rabbi trust" to pay its obligations under an employee benefits plan.[9] According to the Department of Labor, such plans will be considered unfunded under ERISA law. *See, e.g.,* Central Fidelity Banks Op.; Op. Dep't Labor 92-13 A, 1992 WL 112914, 1992 ERISA LEXIS 14 (May 19, 1992); Op. Dep't Labor 91-16 A, 1991 WL 60254, 1991 ERISA LEXIS 16 (Apr. 5, 1991).

In permitting the use of a rabbi trust in the context of an unfunded plan, the Department of Labor considers a number of factors as relevant to the funding analysis. These include

> *representations that the trust assets shall be subject to the claims of the employer's general creditors in the event of the employer's insolvency,* as defined in the [IRS Revenue] Procedure, until paid to plan participants and their beneficiaries in such manner and at such time as specified in the plan(s); *and that it is the intention of the parties that the trust shall constitute an unfunded arrangement* and shall not affect the status of the plan as an unfunded plan maintained for the purpose of providing excess benefits or deferred compensation for a select group of management or highly compensated employees for purposes of Title I of ERISA.

Op. Dep't Labor 91-16 A, 1991 WL 60254, at *1, 1991 ERISA LEXIS at *1-*2. In addition, the model rabbi trust provides:

> The principal of the Trust, and any earnings thereon shall be held separate and apart from other funds of Company and shall be used exclusively for the uses and purposes of Plan participants and general creditors.... Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. *Any rights created under the Plan* [ ] and this Trust Agreement *shall be mere unsecured contractual rights* of Plan participants and their beneficiaries against Company. Any assets held by the Trust will be subject to the claims of Company's general creditors under federal and state law in the event of Insolvency, as defined in [the model trust].
>
> . . . . .
>
> Benefits payable to Plan participants and their beneficiaries under this Trust Agreement may not be anticipated, assigned (either at law or in equity), alienated, pledged, encumbered or subjected to attachment, garnishment levy, execution or other legal or equitable process.

Rev.Proc. 92-64, 1992-33 I.R.B. 11., §§ 1(d), 13(b) (emphasis supplied); *see also* Op. Dep't Labor 91-16 A, 1991 WL 60254, at *1, 1991 ERISA LEXIS 16, at *1 (citing model rabbi trust provisions as relevant to inquiry whether such trust arrangement would be considered unfunded under ERISA). Notwithstanding the lack of specific interest in the trust on the part of plan participants, the trust further provides that it may become irrevocable and that the trustee may institute legal proceedings necessary to force the employer to make contributions to the trust as provided by the trust agreement. The Department of Labor has further opined that the presence of mandatory contribution pro-

9. The Internal Revenue Service has issued a revenue procedure containing a model rabbi trust. *See* Rev.Proc. 92-64, 1992-33 I.R.B. 11.

visions (triggered by a change in control) in such rabbi trust arrangements do not render a plan "funded" for ERISA purposes. *See* Op. Dep't Labor 91–16 A, 1991 WL 60254, at *2, 1991 ERISA LEXIS 16, at *6.

In each of its Opinion Letters, the Department of Labor has focused not so much on the method by which the employer has arranged to pay its obligations under the plan but on the tax consequences of the arrangement. In each of the Opinion Letters, the Department notes that the position of the Internal Revenue Service regarding the tax consequences to the plan beneficiaries would be accorded significant weight in determining whether the plan was funded. That is, the plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made. *See, e.g.,* Central Fidelity Banks Op., 1992 ERISA LEXIS 44, at *6–*7; Op. Dep't Labor 92–13 A, 1992 WL 112914, at *3, 1992 ERISA LEXIS 14, at *7; Op. Dep't Labor 89–22 A, 1989 WL 224558 (ERISA), at *2–*3.

In arguing that the deferred compensation plan is funded, plaintiffs cite to another line of Department of Labor Opinion Letters that, according to the plaintiffs, establish that in order for a plan to be unfunded, six factors must all be present. Plaintiffs primarily rely on what they term the "Tandy Opinion," Op. Dep't Labor. 81–11A, 1981 WL 17732, 1981 ERISA LEXIS 79 (Jan. 15, 1981) ("Tandy Op."), where the corporation (Tandy) established a death benefit plan for employees that would be paid from Tandy's general assets. To cover the liabilities, Tandy intended to purchase life insurance on the participants. According to Tandy, the insurance would be purchased by Tandy and would be payable to Tandy as the beneficiary. Furthermore, the policies would be subject to the claims of Tandy's general creditors and no plan participants would have any rights in the policies. The policies were not described in the plan as the source of the plan benefits or security for the benefits. Finally, the plan did not require or permit employee contributions. Based on these facts, the Department of Labor indicated that the insurance policies would not constitute assets of the plan.

Plaintiffs additionally cite to the "Donnelly Mirrors Inc." and "Industrial State Bank & Trust Co." Opinion Letters. *See* Op. Dep't Labor. 84–10 A, 1984 WL 23425 (ERISA) (Feb. 22, 1984) ("Donnelly Mirrors Op."); Op. Dep't Labor 81–32 A, 1981 WL 17753 (ERISA) (Mar. 23, 1981) ("Industrial State Bank Op."). According to plaintiffs, these Opinion Letters hold that the use of a separately maintained fund, such as a checking account, to accumulate plan assets establishes that a plan is funded.

Plaintiffs' reliance on both sets of Opinion Letters is misplaced. First, in the Tandy Opinion Letter, the Department of Labor at no point stated that each of the elements listed was necessary for the insurance proceeds not to constitute plan assets. Instead, the Opinion Letter merely described the Department's understanding of the plan, based on the corporations' submission to the Department. Second, and more significant, none of the Opinion Letters cited by plaintiffs were addressed to whether a plan was unfunded for the purpose of determining whether it constituted a top hat or excess benefit plan. Instead, the opinion letters were addressed to the question of whether certain trusts, insurance policies, or employee elections to defer income constitute "plan assets" under Title I of ERISA. The Department of Labor has made clear that its analysis for determining whether certain assets are "plan assets" is irrelevant to the inquiry regarding the funded or unfunded status of a plan. *See* Op. Dep't Labor 94–31 A, 1994 WL 501646 n. 3 (ERISA) (Sept. 9, 1994) ("the Department has determined that the analysis outlined above for identifying plan assets is not relevant to" top hat or excess benefit plans); Op. Dep't Labor 90–14 A, 1990 WL 123933, 1990 ERISA LEXIS 12 (May 8, 1990) (Regulation defining when certain monies that are withheld by employer to contribute to employee benefit plan become "plan assets" for purposes of Title I of ERISA is "not relevant" to top hat or excess benefit plans). Finally, at issue in the Donnelly Mirrors and Industrial State Bank Opinion Letters is whether an employee welfare benefit plan may qualify for an exemption from one of ERISA's reporting requirements, *see* 29 U.S.C. § 1023(a)(3)(A),

pursuant to 29 C.F.R. 2520.104–44. These Opinion Letters, therefore, are inapposite.

## DISCUSSION

Although not addressing a plan directly analogous to that at issue in this action, the case law and the Department of Labor's advisory opinions provide the Court with two guiding principles. The first, stated expressly by the Department of Labor and followed in substance by the case law is the principle that "any determination of the 'unfunded' status of a 'top hat' or 'excess benefit' plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law." Central Fidelity Banks Op., 1992 ERISA LEXIS 44, at *6. Second, as set forth in the case law, which is consistent with the Department of Labor's position, *see, e.g.,* Op. Dep't Labor 91–16 A, *ante,* "[f]unding implies the existence of a res separate from the ordinary assets of the corporation." *Dependahl,* 653 F.2d at 1214. From these guiding principles comes a single question that the Court must ask: can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation? Because the Court answers this question in the negative, it must find the plan to be unfunded.

The deferred compensation plan expressly states that no asset of the corporation secures Cluett's obligations under the plan, and that the rights of plan beneficiaries are those of unsecured, general creditors of Cluett. Furthermore, the insurance agreement itself provides:

> The benefits payable under this Agreement shall be independent of, and in addition to, any benefits payable under any other agreement ... that may exist from time to time between the parties hereto, whether as salary, bonus or otherwise.

Nevertheless, to support their claims that the deferred compensation plan is funded by the insurance policies, plaintiffs cite to numerous documents and statements made by Cluett representatives, accountants, and other advisors to Cluett that were made prior to and subsequent to the 1984 restatement.[10] Plaintiffs also describe what they believed, noting that they looked to the insurance policy for the benefits and as security for payment of deferred compensation. These statements, however, are irrelevant to the terms of the 1984 plan. In New York, which governs the construction of both the deferred compensation plan and the insurance agreement,[11] the Court's inquiry into the intention of the parties to an unambiguous agreement must be limited to the words of the agreement. *Stroll v. Epstein,* 818 F.Supp. 640, 643 (S.D.N.Y.), *aff'd* 9 F.3d 1537 (2d Cir.1993) (citing cases). Furthermore, as in *Belsky,* the Court holds that when the language of the plan expressly avoids making a direct tie between the insurance policy and the deferred compensation plan, it must enforce the terms of the plan regardless of the fact that the purpose of the insurance policy was to fund the plan. Thus, the fact that plaintiffs actually looked to the policies as security for deferred compensation cannot defeat the intention of the parties that is unambiguously expressed by the language of the two agreements. As in *Belsky,* the deferred compensation plan unambiguously states that the parties do not intend for any asset of the corporation to secure the rights of plan participants, that such assets would constitute general and unpledged assets of Cluett, and that the participants' rights under the plan "shall be solely those of unsecured creditors of Cluett." Finally, as in *Belsky,* the deferred compensation plan does not mandate that Cluett acquire any assets to finance its liabilities under the plan.

Plaintiffs attempt to minimize the language of the deferred compensation agreement by arguing that Cluett did not acquire or hold any separate insurance policies to fund its

10. In addition, many of the statements quoted by plaintiffs relate to the insurance plan, which is without question funded by the life insurance policies described above. As stated before, the two agreements must be considered separately.

11. Both agreements contain provisions designating New York law as the law governing the agreements.

deferred compensation liabilities. Instead, plaintiffs correctly note that they were the owners of their respective life insurance policies. The issue, however, is not who technically owns the life insurance policies but whether plaintiffs have any rights greater than unsecured creditors to that portion of the life insurance policies that repays Cluett for its investment in the policy and finances the deferred compensation plan. Further, even if ownership of the policies were relevant, as the Court discussed above, plaintiffs' ownership of the policies does not entail all the incidents of ownership; in fact, certain important rights, such as the right to surrender the policy, were assigned to Cluett. Additionally, as the Court has already noted, the benefits under the insurance agreement are "independent of ... any benefits payable under any other agreement." Thus, whatever rights the policy owner may have under the life insurance policy are irrelevant with respect to the deferred compensation plan. In undertaking an investment that will produce income sufficient to recover the costs of the retirement plan, Cluett did not "fund" the retirement plan for purposes of ERISA.

Finally, the Court also notes that its decision is consistent with the relevant Opinion Letters cited above. Although the parties did not indicate whether the Internal Revenue Service has issued any opinion on the tax consequences of the plan at issue or whether the plaintiffs did, during the course of their employment at Cluett, pay taxes on the value of the deferred compensation,[12] two basic principles stated by the Internal Revenue Service strongly suggest that plaintiffs were not subjected to current taxation. Under Section 451(a) of the Internal Revenue Code and Section 1.451–1(a) of the Income Tax Regulations, an item of gross income is includible in gross income for the taxable year in which actually or constructively received by a taxpayer using the cash receipts and disbursements method of accounting. 26 U.S.C. § 451(a); 26 C.F.R. § 1.451–1. Under the regulations, income is constructively received in the taxable year during which it is credited to the taxpayer's account, or set apart or otherwise made available to the taxpayer so that he or she may draw upon it at any time. No income is constructively received, however, if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. 26 C.F.R. § 1.451–2. A "mere promise to pay, not represented by notes or secured in any way, does not constitute receipt of income within the meaning of the cash receipts and disbursements method of accounting." Priv.Ltr.Rul. 90–30–035 (July 27, 1990) (citing IRS Revenue Rulings). Furthermore, under the economic benefit doctrine, deferred compensation will be currently taxable "when assets are unconditionally and irrevocably paid into a fund or trust to be used for the employee's sole benefit." *Id.* (citing *Sproull v. Commissioner,* 16 T.C. 244, 1951 WL 302 (1951), *aff'd,* 194 F.2d 541 (6th Cir.1952) (per curiam); Rev.Rul. 60–31, 1960–1 C.B. 174). None of the above-mentioned principles suggests that plaintiffs presently incur taxes on the value of their deferred compensation. Indeed, the Internal Revenue Service has ruled, with respect to a company's deferred compensation plan in which a bookkeeping account was used in connection with the plan and where all payments under the plan were made from the general assets of the company, that no taxable event would occur until the beneficiaries under the plan were actually paid. As represented to the Service, the accounts did not create claims against specific assets of the company. Priv.Ltr.Rul. 90–30–035. In the instant case, the express terms of the deferred compensation plan state that no assets acquired by Cluett would secure Cluett's obligations under the deferred compensation plan and that any such assets would remain general, unpledged and unrestricted assets of Cluett. Hence, it appears that Cluett's deferred compensation policy does not create current tax liabilities to the plaintiffs.

## CONCLUSION

For the reasons set forth above, the Court holds that Cluett's deferred compensa-

12. As described in an affidavit by one of the defendants in this action, who was involved in EPI's administration and is currently an independent tax accountant and consultant, the deferred compensation plan's "no asset" provision quoted *supra* "ensured that there would be no taxable event occurring each year of plaintiff's participation in the deferred compensation plan." This statement appears to be uncontested by the plaintiffs.

tion plan is unfunded. Plaintiffs' motion for summary judgment is denied. Defendants' motion for partial summary judgment is granted.

SO ORDERED: