**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 01-30174
_____


RELIABLE HOME HEALTH CARE, Inc.; LOUIS T. AGE, Jr.,

                    Plaintiffs-Appellants-Cross Appellees,

versus

UNION CENTRAL INSURANCE COMPANY; Et Al,

                    Defendants,

GLAPION GROUP, Inc.; ROBERT JODY SANDERSON; WALTER A. GLAPION,
Jr.; AMERICAN AUTOMOBILE INSURANCE COMPANY,

                    Defendants-Appellees-Cross-Appellants.


_____

No. 01-30331
_____


RELIABLE HOME HEALTH CARE, Inc.; LOUIS T. AGE, Jr.,

                    Plaintiffs-Appellants,

versus

UNION CENTRAL INSURANCE COMPANY; Et Al,

                    Defendants,

GLAPION GROUP, Inc.; ROBERT JODY SANDERSON; WALTER A. GLAPION,
Jr.; AMERICAN AUTOMOBILE INSURANCE COMPANY,

                    Defendants-Appellees.

_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

July 10, 2002

Before DUHÉ, DeMOSS, and CLEMENT, Circuit Judges.

CLEMENT, Circuit Judge:

Reliable Home Health Care, Inc. ("Reliable") filed suit against the Glapion Group, Inc. ("Glapion") for breach of its fiduciary duties arising out of a deferred compensation plan created by Glapion for Reliable. This case involves a claim of breach of fiduciary duty under ERISA. Prior to trial, Reliable settled with Union Central Insurance Co. ("Union Central") for $165,000. Following a bench trial, the district court found that Glapion breached its fiduciary duty to Reliable by failing to advise Reliable it would lose the cash surrender value in its insurance policies if it stopped paying premiums or by failing to recover the money after it was lost. The court found Glapion liable for $58,075.87, the cash surrender value of the policies. However, no damages were awarded because the court held that Reliable was made whole by its settlement with Union Central. The court also held that each party was to bear its own costs but did award Glapion costs and attorneys' fees in the amount of $8,264.75 for an unsuccessful attempt to take trial testimony via video conference due to plaintiff's lack of cooperation. Both parties timely appealed the court's decision. For the following reasons,

we AFFIRM in part and REVERSE in part.

## I. Facts and Proceedings

Louis Age ("Age") is the CEO for Reliable, a Medicare certified home health care agency doing business in and around New Orleans. Reliable's services include in-home nursing, nursing aid, and rehabilitation services. Age was a licensed insurance broker formerly employed by Union Central. Glapion, owned and operated by Walter A. Glapion, Jr. and Robert J. Sanderson ("Sanderson"), was an agent for Union Central. Mr. Glapion was the general manager for Union Central and wrote insurance for it in addition to other insurance companies.

In 1992, Age contacted Mr. Glapion, a former colleague, concerning having Glapion create deferred compensation plans for Age and other executive employees of Reliable. Age forwarded a copy of a deferred plan seeking one similar to it. He also sent copies of the Medicare regulations for such plans which preclude the use of whole life policies as funding mechanisms. Age informed Glapion that he wanted a deferred compensation plan containing group insurance in addition to a cash product, preferably an annuity.

As a Medicare provider, Reliable was entitled to reimbursement for necessary and reasonable costs which included premiums for payment of policies, including the policies which provided the funding mechanism for the deferred compensation plan. Pursuant to the Medicare cost reimbursement system, Medicare reimburses its

providers, such as Reliable, through interim payments throughout the course of the provider's fiscal year. At the end of each fiscal year, the provider prepares and submits a cost report and trial balance to an intermediary, an organization under contract to the Department of Health and Human Services, for approval. Blue Cross/Blue Shield of New Mexico was designed by the Health Care Financing Administration ("HCFA") as its intermediary for Louisiana. David Fiedler was the intermediary who audited and approved Reliable's cost reports.

Glapion wrote a pension plan for Reliable which was rejected in February 1993 by Fiedler because it included a whole life insurance policy. As a result, Glapion employed an attorney to create an adequate deferred compensation plan for Reliable. The attorney created a prototype for Glapion in September 1993. In March 1994, Fiedler approved the prototype. Glapion used the prototype to make the plan for Reliable and used Selectex as a funding mechanism. The prototype, completed in 1993, was backdated and signed to reflect a November 1992 date, the date on which the Plan was initially created for Reliable. The Plan was signed by Sanderson on behalf of Age.[1]

Despite assertions that he did not sign nor ever see the

---

[1] Age argues that Sanderson was not authorized to sign any documents on his behalf. However, testimony elicited at trial indicated that Age did give other people authority to sign his name.

deferred compensation plan, Age paid the premiums from 1992 until April 1994. Additionally, from 1992 to 1997, Reliable submitted cost reports detailing costs for which it sought reimbursement. The cost reports were submitted to Fiedler who issued a Notice of Program Reimbursement ("NPR") and reimbursed Reliable for costs incurred through the payment of premiums for these years. Age signed the reports certifying that all costs claimed on the reports were permissible under Medicare regulations.

Sanderson was told by Union Central that Reliable's policy was paid up to date with a credit of $39,858.29 on February 22, 1996. A check from Union Central was received in the amount of $15,490.93, made payable to Liberty Bank and Trust, the custodian of Reliable's plan on October 7, 1996.[2] Sanderson advised Age to discontinue payments until a determination could be made as to the whereabouts of approximately $24,000, the difference between the credit Reliable was told it had and the $15,000 check it received.[3] On December 31, 1996, Age was informed by Union Central that he owed $135,418.78 and would be terminated retroactive to April 1, 1994, the date of the last payment, unless the Plan was made

---

[2] While Liberty was the designated custodian and owner of the policies by the Plan, no money was ever deposited with Liberty on behalf of Reliable. No escrow account was ever opened. Dividend checks sent from Union Central to Liberty on behalf of the Reliable participants were endorsed by Liberty and then delivered to the participants.

[3] Unbeknownst to Sanderson, Age had stopped paying premiums to Union Central in April 1994.

current by June 1, 1997. Once Union Central conducted the accounting, Glapion advised Age to resume paying the premiums in order to make the Plan current. Age did not resume payment of the premiums. When the policy was terminated, its cash surrender value was severely depleted because Union Central had instituted the automatic loan provisions of the policies to pay for the delinquent premiums. Age claims he was unaware of the existence of this provision.

Reliable filed suit against Glapion and Union Central, but prior to trial Reliable settled with Union Central for $165,000. The case was then tried before the district court against Glapion for the breach of fiduciary duty claim. Following the bench trial, the court concluded that Glapion had breached its fiduciary duty to Reliable by failing to advise Reliable of the loss of its cash surrender values or negligently failing to cease the relationship with Union Central prior to the depletion of its assets. The district court concluded that Reliable suffered a loss of $58,075.87, the cash surrender value of the policies when the automatic loan provision took effect. However, Reliable was precluded from recovering the loss because it had been fully compensated through its settlement with Union Central. Both Glapion and Reliable appealed the district court's decision.

## II. Analysis

### A. Standard of Review

As a threshold matter, we address the appropriate standard of

6

review.  The existence of an ERISA plan is a question of fact.  *See* Gahn v. Allstate Life Ins. Co., 926 F.2d 1449 (5th Cir. 1991).  Accordingly, we review the district court's determination for clear error.  *See* Fed.R.Civ.Pro. 52(a).  The legal conclusions reached by the district court in applying those facts is *de novo*.  The issue of fiduciary status is a mixed question of law and fact.  Reich v. Lancaster, 55 F.3d 1034, 1044 (5th Cir. 1995).

B.   Did a Valid Plan Exist?

The parties dispute whether a plan ever existed.  The district court held that a plan did exist.  Reliable submits that there is no evidence to support the district court's conclusion that a deferred compensation plan was created specifically for Reliable, while Glapion asserts that there is ample evidence that a plan did in fact exist based on Reliable's actions. We conclude that the district court was correct in finding that a plan did exist.[4]

1.   Was a Deferred Compensation Plan Created for Reliable?

Age first commissioned Glapion to create a deferred compensation plan for Reliable's executive employees in 1992. Reliable requested a plan containing group insurance and a cash product, preferably an annuity.  The initial plan submitted to Fiedler for approval contained an LFP policy, which is a whole life

---

[4] Because there was a valid plan, ERISA clearly governs this action.  *See* Title 29 U.S.C. §§1002(A), 1003(a).

7

policy. Fiedler denied approval of the Plan for failure to comply with Medicare regulations. In 1993, Glapion retained the services of an attorney to draft a new plan prototype to replace the initial plan. The prototype was approved by Fiedler in March 1994. The prototype was applied to the Reliable Plan adding Selectex as the funding mechanism. Reliable argues that the Reliable Plan, although similar to the prototype approved by Medicare, was never actually approved. The prototype was submitted for approval without the funding mechanism. Glapion maintains that Fiedler specifically approved Selectex as a funding mechanism. Because the Plan was not ultimately approved until 1994, Glapion had the Plan back-dated to reflect a November 1992 date, the date when the initial Plan was signed by Age. The district court concluded that a plan was created and approved.[5] We agree.

Reliable submits that, if the Plan was valid, it needed to be reviewed by an intermediary before it could be approved. Because this was never done, no plan existed. The problem with this line of reasoning is that HCFA and the intermediary, Fiedler, assumed a plan to be in effect. Reliable submitted annual cost reports beginning in 1992 and was reimbursed for the premiums paid into the Plan. Whether it was appropriate for the intermediary to reimburse

---

[5] The district court concluded that: "the credible evidence demonstrates that the Medicare approved plan consisted of the prototype plan, the plan description, and the participation agreements. Moreover, the Fiedler and Booth letters show acceptance of the plan by Medicare pursuant to its regulations."

Reliable because no plan existed until 1994 is not an issue reviewable by this Court. For, under Medicare regulations, an intermediary's decision as to the total amount of reimbursement owed to a provider is final and binding and cannot be revisited after three years. *See* 42 C.F.R. §§ 405.1803, 405.1885. Any negligence on the part of Glapion in not creating a valid plan until two years after Reliable began paying premiums was negated by the fact that HCFA and the intermediary assumed that a plan existed as reimbursements were issued for the premiums paid by Reliable into the nonexistant plan. Reliable was reimbursed by Medicare for the premiums it paid into the plan whether it existed or not prior to 1994.

> 2. Was Selectex a Permissible Funding Mechanism for Deferred Compensation Plans?

The district court concluded that Selectex[6] was a valid funding mechanism for the Reliable Plan. Reliable claims that Selectex was a whole life policy precluded by the Plan and by Medicare regulations.[7] As a result, the Plan was invalid. While

---

[6] The record indicates that Seletex is a form of whole life policy with a rapid cash value growth akin to a retirement income contract. Robert Lindenberger, a senior field sales vice-president for Union Central, testified that, while it was a limited pay whole life policy, it fit the definition of a retirement income contract, permissible under Medicare.

[7] Reliable relies on the Provider Reimbursement Manual, an interpretive guideline published by the HCFA, the agency within HHS that administers Medicare. The manual does not have the effect of law. It is persuasive at best. *See* Sta-Home Home

there does not seem to be a dispute that whole life policies were precluded by the Plan and by Medicare, the parties dispute whether Selectex was a whole life policy. There is no doubt that the funding mechanism used was not one desired by Reliable. However, that does not make it an invalid funding mechanism for purposes of the existence of a valid plan under Medicare. Whether HCFA or the intermediary actually approved the specific Reliable Plan and its funding mechanism, the fact is that it was deemed permissible. Reliable sought and received reimbursements for the premiums it paid into a nonexistant plan and subsequently into an existent plan albeit one with an undesirable funding mechanism. The fact that the funding mechanism used was not the one specified by Reliable does not make it invalid under Medicare. Whole life insurance policies can be used to fund deferred compensation plans. However, in a case such as this, a regulatory agency has excluded the use of certain types of policies to fund deferred compensation plans. Medicare expressly precludes the use of whole life policies to fund deferred compensation plans. For five years, Age submitted cost reports and reimbursement requests for the premiums paid into the Selectex policies, and, for five years, Fiedler approved Reliable's cost reports and reimbursement requests. Had Selectex been an

---

Health Agency, Inc., v. Shalala, 34 F.3d 305, 310 (5th Cir. 1994).

improper funding mechanism under Medicare, Reliable would not have been reimbursed for the premiums paid into the policies. Because reimbursements were made for a plan funded by Selectex, Selectex cannot be considered an ordinary whole life policy.

C.     Whether the Reliable Plan is an Unfunded Deferred Compensation Plan for Executive Level Employees Exempting Glapion from the Fiduciary Duties of ERISA.

ERISA's coverage provisions provide that ERISA shall apply to any employee benefit plan with certain enumerated exceptions. A plan falling within such exceptions is one "which is unfunded and...maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §1101(a)(1). These plans, also known as "top hat" plans are exempt from ERISA's fiduciary provisions as well as its participation, vesting, and funding provisions. *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1).

In order to establish whether a plan qualifies as a top hat plan exempt from ERISA's fiduciary duties it must be (1) unfunded and (2) maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. *See* <u>Demery v. Extebank Deferred Compensation Plan</u>, 216 F.3d 283, 287 (2nd Cir. 2000). There is no doubt that the Reliable Plan was created to provide deferred

11

compensation to high level employees. The issue remains whether the Plan was unfunded. ERISA does not define what makes a plan funded or unfunded for determining qualification in a top hat plan nor has this Circuit directly addressed whether a plan is funded for purposes of exemption from ERISA's fiduciary provisions.[8]

The Second Circuit recently addressed the issue in Demery. Bank officers filed suit against the bank for breach of fiduciary duty in relation to a deferred compensation plan. The issue before the court was whether the plan was maintained primarily for a select group of high level employees. The plan was found to be a "top hat" plan, and the court's discussion on funding is instructive. The Second Circuit had previously held that a plan was unfunded in a situation where the benefits were paid "solely from the general assets of the employer." 216 F.3d at 287, *quoting* Gallione v. Flaherty, 70 F.3d 724, 725 (2nd Cir. 1995). Adopting a standard set forth in Miller v. Heller, 915 F.Supp. 651 (S.D.N.Y. 1996), the court asked whether the beneficiary could "'establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the

---

[8] In Spacek v. The Maritime Association, I L A Pension Plan, 134 F.3d 283, 296 (5th Cir. 1998), we noted, in dicta, that top hat plans "are not subject to ERISA's full panoply of regulations."

12

deferred compensation.'" <u>Demery</u>, 216 F.3d at 287, *quoting* <u>Miller</u> at 660. Looking at the plan, the court concluded that it did not give the plaintiffs any greater legal right to the funds than that possessed by an unsecured creditor.

The Eighth Circuit has also addressed the issue. "Funding implies the existence of a res separate from the ordinary assets of the corporation. All whole life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans." <u>Dependahl v. Falstaff Brewing Corp.</u>, 653 F.2d 1208, 1214 (8th Cir. 1981). In <u>Dependahl</u>, the insurance policy purchased by the company was owned by the employee. The Dependahl plan was a whole life insurance plan by which the named beneficiaries of the participant would receive annuity income benefits upon the participant's death, and the employer would recover annual premiums previously paid plus interest. <u>Id</u>. at 1213.

In <u>Belsky v. First National Life Insurance Co.</u>, 818 F.2d 661 (8th Cir. 1987), the Eighth Circuit held that a plan funded through life insurance policies could still be considered unfunded as long as the policies were not separated from the general assets of the company. The <u>Belsky</u> court distinguished between funded and unfunded plans by finding that a plan was "funded when benefits are paid through a specific insurance policy and unfunded when they are

13

paid from the employer's general assets." 818 F.2d at 663. The Belsky policy provided retirement and disability benefits in addition to death benefits. The policy also specifically provided that the rights of the executive would be those of an unsecured creditor. Id. The language of the Belsky plan explicitly stated that the policy became an asset of the bank with no separate res.

The Department of Labor ("DOL"), in an advisory opinion, has also provided guidance on the issue. Op. Dep't Labor 92-13 A (May 19, 1992). "[A]ny determination of the 'unfunded' status of an 'excess benefit' or 'top hat' plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law." DOL has indicated that great weight should be given to the tax consequences of such plans. *See* Op. Dep't Labor 92-13 A; Miller, 915 F.Supp. 651, 659 (holding that a "plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made.")

Therefore, in determining whether a plan is "funded" or "unfunded" under ERISA, a court must first look to the surrounding facts and circumstances, including the status of the plan under non-ERISA law. Second, a court should identify whether a policy is funded by a res separate from the general assets of the company.

14

In so doing, the mere fact that a plan is funded through an insurance policy is not dispositive of a plan's status as funded or unfunded for ERISA purposes.

Glapion maintains that the Plan was unfunded while Reliable asserts that the Plan was funded. Citing the language of the Plan, Reliable asserts that it has a res separate from the assets of the company such that it cannot be considered unfunded. Section 3.1 of the Plan provides:

> This Plan is intended to be a welfare benefit plan that provides either a Death Benefit or Separation Benefit (but not both) to each Participant. All benefits under the Plan shall be provided through the Policy or Policies selected by the Administrator for purchase on the life of each Participant. Each Policy shall be issued to and held by the Custodian for the purpose of providing benefits payable under the Plan to the Participant insured under such Policy. All Employer Contributions shall be applied to the cost of such Policies, and in no event shall the employer be liable for the payment of benefits not paid by the Insurer under the Policy(s). The particulars of the Policy(s) issued for each Participant in connection with this Plan shall be reflected on a schedule to the enrollment application for such Participant.

Reliable is of the opinion that the fact that benefits were funded and paid through an insurance policy makes the Plan "funded" for ERISA purposes. We disagree. *See* Demery, 216 F.3d 283(finding a plan funded with life insurance contracts to be unfunded).

Section 3.2 of the Plan states:

> For each Plan Year and in lieu of payment of additional compensation to the Participant, the Employer shall

15

contribute to the applicable Insurer, on behalf of each Participant whose participation has not ceased during the Plan Year, the amount required to maintain in effect the Policy(s) purchased on the life of the Participant for the purpose of funding the Plan benefits payable to such Participant, less any Plan forfeitures available to reduce Employer Contributions. The total contributions made under this Plan on behalf of a Participant for a Plan Year shall not exceed twenty percent (20%) of the Participant's Compensation for the year. In no event shall a Participant be required or permitted to make contributions to the Plan.

The language of the Plan in addition to the jurisprudence and the DOL advisory opinion lead us to the conclusion that the Reliable Plan was an unfunded top hat plan and therefore exempt from ERISA's fiduciary duties.

The policies purchased by Reliable were not owned by the participants. The only right afforded to the participants under the Plan was to designate death beneficiaries. Participants did not make contributions to the Plan. In fact, they were prohibited from so doing. *See* Section 3.2, *supra.* In addition, the Plan does not intend for participants to incur tax liability in conjunction with the payment of premiums.[9]

D.   Whether Reliable's Fraud Claims are Preempted by ERISA.

Even though top hat plans are exempt from certain ERISA requirements, they are not exempt from its reporting, disclosure,

---

[9] Section 3.3 provides a mechanism by which the employer can request a cash distribution be made to a participant from the policy in an amount necessary to pay any tax costs incurred as a result of Reliable's payment of premiums.

administration, or enforcement provisions. *See* 29 U.S.C. §§ 1021-1045. Reliable argues that, if a valid plan did exist, the fraud allegations are not preempted because they do not directly "relate to" the Plan. Reliable argues that Glapion's liability depends on whether it fraudulently induced Reliable to pay premiums to Union Central based on Reliable's belief, caused by Glapion, that Union Central had expertise in the executive benefit market which was false. Glapion argues that Reliable's fraud claims are mere disguises for its breach of fiduciary duty claims. The claims concern the creation, operation, and subsequent failure of the Plan and are therefore directly "related to" the Plan making it subject to preemption.

ERISA expressly "supercede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "A state law 'relates to' an employee benefit plan 'if it has a connection with or reference to such plan.'" Rozzell v. Security Servs., Inc., 38 F.3d 819, 821 (5th Cir.1994) (quoting Shaw v. Delta Air Lines, 463 U.S. 85, 96-97 (1983)). ERISA preempts a state law claim "if (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship between the traditional ERISA entities--the employer, the plan and its fiduciaries, and the

participants and beneficiaries." Hubbard v. Blue Cross & Blue Shield Ass'n, 42 F.3d 942, 945 (5th Cir. 1995). It is "well-established that the 'deliberately expansive' language of [Section 514(a)]...is a signal that it is to be construed extremely broadly." Corcoran v. United Healthcare, Inc., 965 F.2d 1321, 1328 (5th Cir. 1992)(citations omitted).

Reliable cites Smith v. Texas Children's Hospital, 84 F.3d 152 (5th Cir. 1996), and Hook v. Morrison Milling Co, 38 F.3d 776 (5th Cir. 1994) in support of its position that ERISA does not preempt its fraud claims. In Smith, we held that preemption did not apply to the plaintiff's fraudulent inducement claim because the claim was not necessarily dependent upon Smith's rights under the ERISA plan. 84 F.3d at 155. Smith alleged that she relinquished her accrued benefits with her previous employer in reliance upon Texas Children's alleged misrepresentations. Because her claim was not based solely on Texas Children's denial of benefits, we concluded that she could have a claim based on the benefits she lost as a result of being induced to leave her former employer.

In Hook, we concluded that a plaintiff's unsafe workplace claim did not relate to her ERISA plan and was therefore not preempted. The plaintiff in Hook was injured in an accident at work, and the ERISA plan paid her medical expenses. Subsequently, she filed a claim for wrongful discharge and negligence against her

18

employer. We considered whether "the underlying conduct...[could] be divorced from its connection to the employee benefit plan." Hook, 38 F.3d at 783, *quoting*, Christopher v. Mobil Oil Corporation, 950 F.2d 1209, 1220 (5th Cir.1992). Hook's cause of action was based on her allegation that the employer failed to maintain a safe workplace, not from a dispute over the administration of the ERISA plan or the disbursement of benefits therefrom. Hook, 38 F.3d at 783.

The fraud claims asserted by Reliable involve Glapion's failure to inform Reliable that the Plan was not implemented in 1992 when Age signed the Trust Agreement and whether an invalid funding mechanism was used. We find this Court's decision in Christopher more analogous to the present facts than Smith or Hook. The allegations in Christopher of fraud, negligence, and breach of contract were based on "Mobil's amendment of an ERISA-governed employee benefit plan and Mobil's disclosure to its employees of the terms of the plan." 950 F.2d at 1218. We noted that the plan as it existed prior to the amendment and the language of the amendment would have to be examined in order to adjudicate the plaintiffs' claims. The Court found that such analysis, given the expansiveness of Section 514(a) warranted preemption. We conclude that the same reasoning applies to the instant case. The underlying conduct alleged by Reliable cannot be severed from its

connection to the Plan. Therefore, we affirm the district court's determination that Reliable's state law claims are preempted.

E. Remaining Claims.

1. Costs and Attorneys' Fees

The district court entered judgment ordering each party to bear its own costs. We have taken the position that when a district court does not award costs to a prevailing party, it must give reasons for so doing. Walters v. Roadway Exp., Inc., 557 F.2d 521, 526-27 (5th Cir. 1977); *See also* Schwarz v. Folloder, 767 F.2d 125, 131 (5th Cir. 1985). In light of our reversal on the merits, on remand, if the district court concludes not to award costs, reasons should be given.

2. Costs and Attorneys' Fees Related to the Taking of Trial Depositions.

During trial, the district court allowed counsel for Glapion to take the testimony of two Union Central employees via video conference. The effort was unsuccessful due to plaintiff counsel's lack of cooperation. The court ordered the depositions to be taken in person and indicated that the plaintiffs would be taxed costs and expenses for the depositions. Glapion submitted a cost summary of the taking of the depositions totaling $8,264.75. We affirm the district court's decision to tax costs and expenses against Reliable in conjunction with the taking of the

depositions.[10]

### III.  Conclusion

We conclude that a valid funding mechanism and plan existed and that Reliable's state law fraud claims are preempted.  We also conclude that Glapion is exempt from ERISA's fiduciary duties because the Reliable Plan is an unfunded top hat plan.  We therefore reverse the district court's determination that Glapion was a fiduciary and that it breached its duty to Reliable.  We also reverse and remand the district court's decision not to award attorney's fees and costs in a manner consistent with this opinion.

---

[10] Reliable argues that it was forced to pay Glapion for items which are not compensable by statute or the Federal Rules. We disagree.  The record clearly indicates that Reliable forced the added expense of taking trial depositions after agreeing to a video examination during trial.  While not all the items listed by Glapion in submitting its costs in conjunction with the deposition are taxable under Title 28 U.S.C. §1920, they were nonetheless appropriate and within the court's discretion on alternative grounds.