**In re DOWNEY REGIONAL MEDICAL CENTER–HOSPITAL, INC., Debtor.**

**Allen R. Korneff, Appellant,**

**v.**

**Downey Regional Medical Center–Hospital, Inc.; ING Life Insurance and Annuity Company, Appellees.**

**BAP No. CC–10–1188–NoPaD.**

**Bankruptcy No. LA 09–34714 BB.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Sept. 23, 2010.

Decided Nov. 16, 2010.

Richard D. Burstein, Ezra Brutzkus Gubner LLP, Woodland Hills, CA, for Allen R. Korneff.

Lisa Hill Fenning, Arnold & Porter, LLP, Los Angeles, CA, for Downey Regional Medical Center–Hospital, Inc.

Before: NOVACK,[1] PAPPAS and DUNN, Bankruptcy Judges.

1. Hon. Charles Novack, Bankruptcy Judge for the Northern District of California, sitting by designation.

## OPINION

NOVACK, Bankruptcy Judge.

Appellant Allen Korneff ("Korneff") appeals from an order approving a stipulation between debtor Downey Regional Medical Center–Hospital, Inc. ("Downey") and ING Life Insurance and Annuity Company ("ING") regarding turnover of more than $1.6 million that Downey had deposited with ING ("ING account") pursuant to a deferred compensation plan. Korneff, Downey's former CEO and a participant in the plan, objected to the stipulation and asserted that approximately $1.4 million in the ING account belonged to him, rather than Downey's bankruptcy estate. Rejecting Korneff's request to proceed by adversary proceeding, the bankruptcy court determined as a matter of law that the funds in the ING account were property of the bankruptcy estate and approved the stipulation providing for the liquidation of the ING account and its transfer to Downey for its unrestricted use.

For the following reasons, we AFFIRM.

## I. FACTS

### A. Prepetition Background.

1. *AHA's Master Compensation Deferral Plan.*

In April 1975, the American Hospital Association ("AHA") established a Master Compensation Deferral Plan ("Master Plan"). AHA members and affiliated organizations could adopt the Master Plan and, through it, provide retirement bene-

fits to their officers and employees. Under its terms, participants could defer a portion of their compensation in return for future benefits provided through the Master Plan. The deferred compensation would remain part of the participating employer's unrestricted assets and would not be held in trust. The employer's obligations under the Master Plan were "purely contractual" and not "funded or secured in any way."

Shortly after establishing the Master Plan, the AHA requested and the Internal Revenue Service provided a letter ruling regarding the tax consequences of any such deferred compensation. The IRS ruled that deferred amounts would constitute income to a participant only when the deferred amounts were paid or made available to the participant, not when they were earned. To fall within the ruling, deferred compensation had to remain the sole property of the AHA,[2] subject to claims of its general creditors and available for whatever purpose the AHA desired to use it.

In June 1983, the Master Plan was amended and restated, but it retained the essential character of the 1975 plan by allowing eligible[3] officers, employees and contractors of a participating employer to defer compensation pursuant to the restated Master Plan. As restated, the Master Plan expressly provided that

> All amounts of compensation deferred[4] under this Plan, all property and rights which may be purchased by the Employer with such amounts and all income attributable to such amounts, property or rights to property shall remain the

2. The scope of the IRS ruling was expressly limited to the AHA and the Master Plan. The IRS advised that AHA members should request separate rulings with respect to their own plans.

3. Participants had to meet certain eligibility requirements of the Employee Retirement In-

come Security Act of 1974 ("ERISA") for unfunded plans of deferred compensation.

4. The 1983 Master Plan defined deferred compensation to include "Compensation not yet earned, ... which the Participant and the Employer mutually agree shall be deferred in accordance with the provisions of this Plan."

sole property and rights of the Employer without being restricted by the provisions of this Plan, subject only to the claims of the Employer's general creditors. The obligation of the Employer under this Plan is purely contractual and shall not be funded or secured in any way.

It further authorized the AHA and its members to invest deferred compensation in an annuity contract with Aetna Life Insurance and Annuity Company ("Aetna") from which benefits under the Master Plan could be paid. Investment in an annuity contract was for the employer's convenience, and the annuity remained the sole property of the employer. The annuity contract could not be held in trust or as collateral security for the benefit of any participant.

### 2. Downey's Deferred Compensation Plan And Related Investment Account.

In December 1978, with Korneff as its CEO, Downey adopted the Master Plan and established a deferred compensation plan for its employees. It also elected to participate in the group annuity contract issued by Aetna, ING's predecessor, to fund the benefits due under the Master Plan. The ING account, formally styled "Downey Community Hospital VK 1473," was in Downey's name.

Korneff, the first person to participate in Downey's deferred compensation plan, signed a Participation Agreement on June 27, 1984. In the agreement, he elected to defer a portion of his annual compensation in return for the benefits provided in the Master Plan. The benefits due were to be determined as if Korneff's deferred compensation had been invested in the Aetna annuity contract and accumulated in the Aetna investment funds that he specified. Korneff acknowledged receipt of the Master Plan and represented that he understood its provisions. He further acknowledged that the Aetna annuity contract was "exclusively owned and controlled by [Downey] subject to the claims of [Downey's] general creditors." By January 2010, the ING account held approximately $1.4 million attributable to Korneff's compensation deferrals. He did not pay income tax on the deferred amounts.

Five other doctors ("doctor participants") employed by Downey also elected to participate in Downey's deferred compensation plan. The portion of the ING account attributable to their aggregate deferred compensation was approximately $200,000.

### B. Postpetition Facts And Procedural History.

In 2009, Downey suffered a liquidity crisis created by internal accounting and financial infrastructure problems. Downey sought relief from its financial turmoil by filing a Chapter 11 petition on September 14, 2009.

In January 2010, Korneff filed two proofs of claim in the bankruptcy case. The first claim was for damages arising from Downey's rejection of Korneff's employment agreement. The second, filed as a "protective" claim, asserted that Korneff owned various retirement accounts held by Downey, including $1.4 million in the ING account.

A few months later, in a letter dated March 31, 2010, Downey's President and CEO advised Tom Otto of Centaurus Financial that the funds held in the ING account were property of Downey's bankruptcy estate and were subject to the claims of Downey's general creditors. Downey instructed Otto to provide a detailed accounting of the assets in the account, to liquidate it and to transfer the funds to Downey.

Although ING has never asserted any ownership or beneficial interest in the ING account, ING initially refused to turn over the funds due to its belief that Downey had assigned some interest in the funds to the Social Security Administration ("SSA") for Medicare reimbursements. Downey and ING thereafter agreed that ING would turn over the proceeds of the ING account to Downey on two conditions: 1) Downey had to obtain a court order authorizing the turnover after notice and hearing to the SSA and the participants in Downey's deferred compensation plan; and 2) Downey had to release and indemnify ING.

On April 28, 2010, Downey filed an emergency motion to approve a stipulation reflecting its agreement with ING. An initial hearing was held the next day, and Korneff appeared through counsel.

At the hearing, the bankruptcy court questioned whether Downey had provided adequate notice to all interested parties. Downey's counsel conceded that notice was not sufficient and requested a continuance to re-serve notice and to address issues raised by Korneff. Through counsel, Korneff urged that an adversary proceeding was required to determine whether the funds in the deferred compensation account were excluded from the bankruptcy estate under § 541(b)(7) of the Code. The bankruptcy court continued the hearing for two weeks, directed Downey's counsel to re-serve the moving papers and set a briefing schedule for any opposition to be filed.

Korneff filed the only written opposition to Downey's emergency motion to approve its stipulation with ING.[5] Korneff argued that a bona fide dispute existed concerning whether the ING account funds were excluded from Downey's bankruptcy estate under § 541(b)(7). He asserted that Downey's deferred compensation plan was "subject to" ERISA and that $1.4 million in the ING account had been "withheld" from his wages within the meaning of § 541(b)(7). He insisted that an adversary proceeding with discovery was required to resolve this dispute and advised the bankruptcy court that he had retained a forensic accountant who could substantiate his claim that the funds had been withheld from his wages. Korneff also argued that ING account statements, which listed him as a participant, provided additional evidence that the funds belonged to him. He further submitted a page from Downey's 2005 tax return, Form 990. Based on that single page, Korneff asserted that Downey had booked $70,256 in 2005 contributions to employee benefit plans on behalf of Korneff, including $30,600 paid into the ING account. Korneff opined that Downey's tax-related characterization of the $70,256 as an expense rather than income demonstrated that it was "withheld" income as opposed to "deferred" income.

At the final hearing, the bankruptcy court heard additional argument from Korneff's counsel. In sum, counsel urged that the bankruptcy court should ensure that Korneff received due process in the form of an adversary proceeding or, at a minimum, an evidentiary hearing before deciding whether the ING account constituted property of Downey's estate. Counsel represented that, if given an opportunity, Korneff would offer expert testimony on the meaning of the phrase "subject to Title I of ERISA" as used in § 541(b)(7). He further stated that Korneff would offer

---

5. Between the initial and final hearings on the emergency motion to approve the stipulation, Downey agreed to create a $100,000 reserve from any ING account funds turned over pending the SSA's inquiry into whether it had any Medicare reimbursement claims against the funds. The government ultimately concluded that it had no such claims.

Downey's tax returns to demonstrate how Downey treated its payments into the ING account for tax purposes, and would provide expert testimony on what it means to "withhold" money from wages under § 541(b)(7). An attorney specializing in employee benefits and executive compensation also argued on Korneff's behalf during the May 13 hearing. He opined that 1) top-hat deferred compensation plans are "subject to Title I of ERISA" within the meaning of § 541(b)(7); 2) Downey's deferred compensation plan might not qualify as a top-hat plan; and 3) there is no distinction between "withholding" compensation and "deferring" compensation for purposes of § 541(b)(7).

At the conclusion of the hearing, the bankruptcy court overruled Korneff's objection, finding that:

1. There were no material issues of fact that required an adversary proceeding;

2. All issues could be resolved as a matter of law based on a simple reading of the operative documents and the admitted facts;

3. The undisputed facts established that the funds on deposit with ING were not excluded from the estate under § 541(b)(7);

4. Deferral of compensation is not the same as having funds withheld from one's wages as required by § 541(b)(7); and

5. Downey's deferred compensation plan was not a plan subject to Title I of ERISA or a deferred compensation plan under § 457 of the Internal Revenue Code.

The bankruptcy court explained that there was no genuine issue of material fact be-

cause the parties agreed on (a) the authenticity of the documents governing Downey's deferred compensation plan, (b) where the funds were located and (c) the manner in which the ING account was established. It further added that, in drafting § 541(b)(7), Congress never intended to permit highly compensated executives to contribute unlimited amounts to a deferred compensation plan on which they paid no tax and yet be able to exclude the plan funds from the employer's bankruptcy estate.

Following the bankruptcy court's ruling, counsel for ING questioned whether Downey had sufficiently re-served notice on the five doctor participants. Although Downey's counsel could not locate a proof of service to establish service on the doctor participants, she stated that she had seen the mailing envelopes and was certain that the doctor participants had been served. The bankruptcy court directed Downey's counsel to submit a supplemental proof of service along with the proposed order. That same day, Downey filed a Supplemental Proof of Service stating that on May 3, 2010 Downey had served its emergency motion to approve stipulation and the notice of continued hearing on each of the doctor participants by overnight mail.[6] The bankruptcy court entered its order approving the stipulation between Downey and ING and finding that proper notice had been given to the doctor participants ("Turnover Order").

On May 25, 2010, Korneff, represented by new counsel, filed an emergency motion for a stay pending appeal of the Turnover Order. The motion urged that the potential harm to Korneff was enormous if the ING account funds were turned over to Downey. In addition, Korneff asserted

---

**6.** The Supplemental Proof of Service was signed by one of the attorneys for Downey, but it is not signed under oath or as an unsworn declaration under penalty of perjury as required by Fed.R.Civ.P. 4(l)(1), made applicable by Rule 7004(a)(1).

that a likelihood of success on the merits and the lack of prejudice to the estate justified the issuance of a stay.

The bankruptcy court denied Korneff's request for a stay. It reiterated that it had ruled on the issues as a matter of law based on undisputed facts and concluded that Korneff had failed to demonstrate a likelihood of success on the merits of his appeal. It found that Korneff had actual notice of Downey's emergency motion to approve the stipulation for turnover of the ING account and ample opportunity to be heard on all relevant issues. The bankruptcy court also concluded that Korneff lacked standing to address any alleged lack of notice to the doctor participants.

The appellant timely filed a notice of appeal.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and § 157(b)(2)(E). We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUES

1.  Did the bankruptcy court err when it determined that no adversary proceeding was required?

2.  Did the bankruptcy court err when it determined that, as a matter of law, the funds in the ING account were not excluded from the bankruptcy estate under § 541(b)(7)?

## IV.  STANDARDS OF REVIEW

■ We review the bankruptcy court's decision not to require an adversary proceeding using a harmless error analysis. *USA/Internal Revenue Service v. Valley Nat'l Bank (In re Decker)*, 199 B.R. 684, 689 (9th Cir. BAP 1996). The bankruptcy court's findings of fact are reviewed for clear error, while its conclu-

sions of law, including construction of the Code and Rules are subject to de novo review. *Cogliano v. Anderson (In re Cogliano)*, 355 B.R. 792, 800 (9th Cir. BAP 2006). Whether property is included in a bankruptcy estate is a question of law that is reviewed de novo. *Id.*

## V.  DISCUSSION

### A.  The Bankruptcy Court's Decision Not To Require An Adversary Proceeding, Even If Erroneous, Was Harmless.

■ Korneff steadfastly argues that an adversary proceeding was required to resolve ownership of the ING account funds. The bankruptcy court disagreed and considered its ruling to be in the nature of summary judgment in a contested matter. The court specifically stated that it was deciding the issues as a matter of law on the basis of undisputed facts.

■ Even if Downey's emergency motion constituted a proceeding to determine an interest in property that required an adversary proceeding, Fed. R. Bankr.P. Rule 7001(2), the bankruptcy court's decision not to require an adversary proceeding is subject to a harmless error analysis. *Austein v. Schwartz (In re Gerwer)*, 898 F.2d 730, 734 (9th Cir.1990); *In re Decker*, 199 B.R. at 689. Under this standard, if the absence of an adversary proceeding did not cause prejudice, form should not be elevated over substance. *Decker*, 199 B.R. at 689. The question then is whether some procedural difference between contested matters and adversary proceedings prejudiced Korneff. The record here indicates that, even if viewed as erroneous, the bankruptcy court's decision resulted in no harm to Korneff.

■ Korneff first asserts that without service of summons as in an adversary proceeding there was insufficient process

to gain jurisdiction over the parties to the dispute. While a contested matter lacks the formality of a summons, complaint and answer that are required in an adversary proceeding, the initial pleading in a contested matter, the motion, is served in the same manner as a summons in an adversary proceeding. Fed. R. Bankr.P. Rule 9014(b). Thus, parties in both contested matters and adversary proceedings are entitled to the same quality of process. The absence of a summons does not provide a basis for finding prejudice here.

■ Korneff additionally asserts that there is no proper proof of service to establish that the doctor participants were properly served with Downey's moving papers. As a result, he contends that the bankruptcy court adjudicated the ownership of the ING account funds without obtaining jurisdiction over all necessary parties. There is no dispute that the bankruptcy court had personal jurisdiction over Korneff. He had actual notice of the motion to approve stipulation and the issues it raised. He was represented by counsel at both the initial and the final hearing on the motion and was afforded a reasonable opportunity to respond. He received the process that was due to him. *Smith v. Wheeler Tech., Inc. (In re Wheeler Tech., Inc.)*, 139 B.R. 235, 239–40 (9th Cir. BAP 1992) (due process requires notice reasonably calculated to apprise interested parties of the pendency of an action and to afford them an opportunity to present their objections).

■ With respect to the doctor participants, it is important to note that personal jurisdiction is an individual right. *Parsons v. Plotkin (In re Pac. Land Sales, Inc.)*, 187 B.R. 302, 309 (9th Cir. BAP 1995). In asserting that the bankruptcy court did not have personal jurisdiction over the doctor participants due to defective service of process, Korneff is attempting to assert the doctors' individual constitutional rights to due process. He has no standing to do so. *Id.* at 310. As the Panel in *Pacific Land Sales* explained, federal courts must be hesitant to resolve controversies involving the rights of third parties not before the court. It may be that the holders of those rights have simply chosen not to assert them. *Id., citing Singleton v. Wulff,* 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

Korneff argues, however, that the doctor participants are indispensable parties to the dispute over ownership of the funds. While Rule 7019, which provides for mandatory joinder of necessary parties, applies in adversary proceedings, it is not included in the list of Bankruptcy Rules that apply to contested matters under Rule 9014. Korneff seems to argue that the absence of an adversary proceeding prejudiced him because he could not join the parties necessary to adjudicate ownership of the ING account funds.

■ Joinder of a party under Rule 7019 is required when 1) in its absence complete relief cannot be accorded among those already parties, or 2) the absent party claims an interest relating to the subject of the action and disposition of the action in its absence might impair or impede its ability to protect that interest or leave the present parties subject to a substantial risk of double, multiple or inconsistent obligations. Because the doctor participants do not appear to be necessary parties under Rule 7019, Korneff has not suffered prejudice from their absence. The dispute here is over ownership of liquid funds. Complete relief between Korneff and Downey, namely ownership of the portion of the ING account attributable to Korneff, was fully adjudicated. The presence or absence of the doctor participants could not cause him to lose any more or any less. Under the second prong of Rule 7019, it is

not apparent that the absent doctor participants are claiming any interest in the ING account. Further, Korneff has failed to point out any double, multiple or inconsistent obligations that might result from their absence. Thus, there is no evidence that the inability to join the doctor participants prejudiced Korneff, and the bankruptcy court's failure to proceed by way of adversary proceeding again appears harmless.

Beyond his due process and jurisdictional arguments, Korneff contends that he was prejudiced because the bankruptcy court did not permit him to conduct discovery and present expert testimony to interpret the terms "withheld" and "subject to" in the context of § 541(b)(7). This argument is unavailing. First, Korneff was not without an opportunity for discovery. Rule 9014 makes discovery available in contested matters. Korneff could have initiated discovery as soon as Downey filed its emergency motion to approve stipulation. Discovery often proceeds more expeditiously in a contested matter; and Korneff could have but did not serve discovery before the continued hearing on the emergency motion.

More importantly, Korneff has not identified any discoverable *fact* that would have changed the outcome of the court's ruling. The bankruptcy court based its ruling on undisputed and unambiguous terms of Downey's deferred compensation plan as well as the court's interpretation of § 541(b)(7). Korneff's

proposed discovery and expert testimony would have been inappropriate because both the interpretation of an unambiguous written contract and the meaning of a statute are questions of law. *McHugh v. United Serv. Auto. Ass'n,* 164 F.3d 451, 454 (9th Cir.1999) (expert testimony cannot be used to provide legal meaning or to interpret contracts); *Southland Corp. v. Emerald Oil Co.,* 789 F.2d 1441, 1443 (9th Cir.1986) (interpreting written contract is a matter of law); *Nellis v. G.R. Herberger Revocable Trust,* 360 F.Supp.2d 1033, 1043 (D.Ariz.2005) (expert testimony about obvious meaning of statute was inappropriate legal opinion).

Here, the bankruptcy court provided all of the procedures required in a motion for summary judgment. The facts material to determining ownership of the fund were undisputed. It was not error to decline Korneff's request for discovery when there was no apparent issue of fact. *Khachikyan v. Hahn (In re Khachikyan),* 335 B.R. 121, 127 (9th Cir. BAP 2005) (debtor seeking an adversary proceeding failed to articulate factual issues requiring discovery).

**B. The Bankruptcy Court Correctly Determined That The Funds In The Deferred Compensation Account Were Not Excluded From Property Of The Estate.**

On appeal, there is no real dispute that Downey's deferred compensation plan was an unfunded top hat plan.[7] Be-

---

7. In the bankruptcy court, Korneff argued that Downey's deferred compensation plan might not qualify as a top hat plan, but he has not made that argument on appeal. Under ERISA a top hat plan must be 1) "unfunded," and 2) "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

While ERISA does not define "unfunded," several circuit courts have recognized that a plan is unfunded where: 1) beneficiaries of the plan cannot look to a res separate from the general assets of the corporation to satisfy their claims or 2) beneficiaries of the plan have no legal rights greater than those of general, unsecured creditors to the assets of the employer. *See, e.g., Accardi v. IT Litigation Trust (In re IT Group, Inc.),* 448 F.3d 661,

cause the parties did not dispute the authenticity of the documents establishing Downey's deferred compensation plan or the terms of the plan, the bankruptcy court correctly relied on the unambiguous provisions of the plan to determine that the ING account funds were property of the estate. The ING account was held in Downey's name and the plan documents plainly provided that compensation deferred under the plan would remain part of Downey's unrestricted assets and would not be held in trust. The plan was unfunded and Downey's obligations were purely contractual in nature. The participation agreement that Korneff executed similarly acknowledged that any contributions to the ING account remained the sole property of Downey. Based on these undisputed facts, the bankruptcy court correctly determined that Korneff held no interest in the ING account funds. The interpretation of a written contract is a matter of law. *Southland Corp. v. Emerald Oil Co.,* 789 F.2d at 1443. Summary judgment can be appropriate where the dispute is over the interpretation, not the content, of the contractual terms. *See Continental Insur. Co. v. Metro–Goldwyn–Mayer, Inc.,* 107 F.3d 1344, 1346 (9th Cir. 1997).

The controversy on appeal concerns the proper application of § 541(b)(7) to top hat plans. Under § 541(b)(7) of the Bankruptcy Code, property of the estate does not include any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of ERISA. 11 U.S.C. § 541(b)(7)(A) and (B). Korneff contends that this code section excluded the ING account funds from

Downey's bankruptcy estate. He argues that Downey withheld the ING account funds from the wages of its employees pursuant to a deferred compensation plan and that the plan was subject to ERISA. He urges that the bankruptcy court erred when it concluded that "deferring" compensation is something different than having funds "withheld" from one's wages and that Downey's deferred compensation plan was not "subject to" Title I of ERISA.

Since § 541(b)(7) was added to the Code in 2005, only a few courts have considered whether that section applies to unfunded top hat plans. Those few courts have uniformly concluded, however, that an agreement to defer income is qualitatively different from the type of "withholding" contemplated in § 541(b)(7)(A)(i)(I). *See In re The Colonial BancGroup, Inc.,* 436 B.R. 695, 711–12 (Bankr.M.D.Ala.2010); *Synovus Trust Co. v. Bill Heard Enters., Inc. (In re Bill Heard Enters., Inc.),* 419 B.R. 858, 867–68 (Bankr.N.D.Ala.2009); *Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.),* 387 B.R. 95, 114 (Bankr.D.Del.2008).

Although declining to decide the issue on a motion to dismiss, the court in *New Century Holdings* suggested that "withholding" implies that the employee possessed the income at some point while a "deferral" implies an agreement to receive the income in the future with no past or present right to possession. *In re New Century Holdings, Inc.,* 387 B.R. at 114. The *Bill Heard Enterprises* court reached a similar conclusion, explaining that income is withheld when an employee has a present entitlement to the income, but for some reason the employer declines to give

668 (3d Cir.2006); *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.,* 295 F.3d 505, 513–14 (5th Cir.2002); *Demery v. Extebank Deferred Comp. Plan (B),* 216 F.3d 283,

287 (2d Cir.2000); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1214 (8th Cir. 1981).

it to the employee. By contrast, an employee deferring compensation has no present entitlement to the income. *In re Bill Heard Enters., Inc.*, 419 B.R. at 867–68.

While acknowledging the strength of the distinction between present and future entitlement, the bankruptcy court in *Colonial BancGroup* found more "organic" problems with excluding the assets of a top hat plan from property of the estate. First, the court pointed out that if § 541(b)(7) is interpreted to exclude assets of an "unfunded" plan from property of the employer's estate, then those assets effectively would be removed from the reach of the employer's general unsecured creditors. That result would be at odds with the structure and purpose of unfunded top hat plans (income tax deferral) which depend on the deferred compensation remaining subject to the claims of unsecured creditors. *Colonial BancGroup*, 436 B.R. at 712. Second, the plan before that court, like Downey's plan, specifically provided that the participants had no ownership interest in the funds. As a result, removing the plan funds from the estate would not establish ownership in the participants. Because the participants had nothing more than unsecured contractual claims against the estate, excluding the plan assets from the estate would merely reduce the assets available to satisfy the participants' claims. *Id.*

Although none of these decisions is binding, the analysis of each is sensible and persuasive. As a result, we adopt their reasoning and determine that the bankruptcy court correctly found that the funds in the ING account were not "withheld" from wages as required by § 541(b)(7). In light of that determination, it makes no difference whether Downey's deferred compensation plan was "subject to" ERISA.

## VI.  CONCLUSION

Based on the foregoing, even if it were error, the bankruptcy court's decision not to proceed by way of an adversary proceeding was harmless. Additionally, the bankruptcy court correctly determined that the funds from the ING account constitute property of the estate. We AFFIRM the decision of the bankruptcy court.