FILED

SEP 05 2013

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. MT-12-1364-JuTaPa |
| JOHN TRAVIS ALDRICH and ALDORA JUNE ALDRICH, | Bk. No. 11-60839-RBK |
| Debtors. | Adv. No. 11-00054-RBK |
| JOHN TRAVIS ALDRICH; ALDORA JUNE ALDRICH, | |
| Appellants, | |
| v. | M E M O R A N D U M* |
| ALBERT STEVEN JUNKERT, | |
| Appellee. | |

Argued and Submitted on July 25, 2013
at Butte, Montana

Filed – September 5, 2013

Appeal from the United States Bankruptcy Court
for the District of Montana

Honorable Ralph B. Kirscher, Chief Bankruptcy Judge, Presiding

_____

Appearances:     Craig D. Martinson, Esq., of Patten, Peterman, Bekkedahl & Green, PLLC argued for appellants Aldora and John Aldrich; Jack E. Sands, Esq., of Sands Law Office, argued for appellee Albert Steven Junkert.

_____

Before:   JURY, TAYLOR, and PAPPAS, Bankruptcy Judges.

---

     * This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Appellee, Albert Steven Junkert (Steve), filed an adversary proceeding against chapter 7[1] debtors, Aldora and John Aldrich, seeking to quiet title to real property, referred to as Tract 2, that was listed in debtors' Schedule A. After a trial, the bankruptcy court entered judgment in favor of Steve, finding an enforceable oral contract between the parties for the transfer of Tract 2 and ordering debtors to quitclaim the property to Steve upon payment of $27,956.25. This appeal followed. We AFFIRM.

## I. FACTS[2]

This is a dispute among family members. Aldora Aldrich is Steve's sister. Tract 2, consisting of 62 acres, was part of 320 acres located in Huntley, Montana, that were owned by Steve and Aldora's father and mother, Albert and Julia Junkert. Albert and Julia had five children: Steve, Aldora, Krista Junkert, Adella Hammerstrom and Allena Junkert.

In 1985, Albert and Julia deeded 20 acres from their 320-acre parcel to debtors.[3] Debtors currently reside on the 20-acre parcel. For the past forty to forty-five years, Steve lived on a 19.809-acre parcel of Albert and Julia's property (Tract 1). For thirty-five or so years, Steve operated a gravel

_____

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] Many of the facts are taken from the bankruptcy court's Memorandum of Decision and Order entered June 22, 2012.

[3] It is unclear from the record how the 20 acres was deeded to debtors when the 320 acres was not yet subdivided.

-2-

and dump truck business on Tract 2.  Tracts 1 and 2 comprise the northern portion of the 320-acre parcel and debtors' 20-acre parcel lies just to the south of Tract 2.

Steve, who is developmentally disabled, graduated from high school receiving a special education certificate.  Julia, while alive, kept the books for Steve's business and before 2003, Steve did not have a checking account in his name.  Prior to her death, Julia would invoice Steve's customers, deposit the income from Steve's business into her personal checking account and pay all Steve's bills.  Steve never had a loan in his own name and when he needed a loan for his business, the loan was obtained in Julia's name.  Julia also oversaw the preparation and filing of Steve's income tax returns.  After Julia passed away in 2000, Allena Junkert and Aldora took over Steve's books.  They would deposit Steve's business income into their personal checking accounts and would pay Steve's bills from their personal accounts.

Pursuant to a Last Will and Testament dated June 6, 2002, Albert provided for the division of his personal assets and his 300 remaining acres.  Under the Last Will and Testament, debtors were not left any property, other than the 20 acres they received in 1985.  Debtors' three children (Travis, Alicia and Andrea) were willed a combined sum of 42 acres.  Steve was awarded 62 acres per Albert's Last Will and Testament; Allena Junkert was awarded 62 acres, which included Albert's residence; Krista Junkert was awarded 62 acres; and Adella Hammerstrom and her children were awarded a total of 62 acres.

At the time of his death, Albert's 300 remaining acres were

-3-

not subdivided, the acreage was encumbered by a mortgage[4] and Albert had other miscellaneous debts. In an effort to satisfy the mortgage and debts, Albert's Estate sold approximately 65 acres to Gabel Construction, receiving net proceeds of $58,887.00. The two representatives of Albert's Estate were also contemplating selling additional acreage to Gabel Construction to fully satisfy the mortgage and debts and to pay for the expenses associated with dividing the 300 acres. Had the Estate followed through with its plan, debtors' 20 acres would be surrounded on three sides by property owned by Gabel Construction. Aldora opposed the second sale to Gabel Construction and instead wanted to keep the property together, with her children receiving the property surrounding debtors' 20 acres.

A dispute arose between Steve and Albert's Estate over some personal assets, a claim Steve was asserting against the Estate, and a claim the Estate was asserting against Steve for gravel extracted by Steve from the property. Steve hired an attorney to help him with the dispute. At some point, Aldora joined Steve in the action against Albert's Estate, although she did not have a dispute under Albert's Will. According to Aldora, she wanted to help Steve with his claims and the paperwork.

Steve, Aldora and Albert's Estate eventually reached a resolution, which was reflected in a Stipulation dated July 20, 2004. Per the Stipulation, Steve's claim against the Estate was

---

[4] The mortgage payments between January 16, 2003, and May 2, 2005, and the final payoff made by the Estate totaled approximately $63,214.00.

-4-

disallowed in full, the Estate's claim against Steve was disallowed in full, and personal property was divided. As for the real property, the parties agreed that Aldora and Steve could purchase property that would have been sold to Gabel Construction.

On March 31, 2005, debtors and Albert's Estate entered into a Contract for the Sale and Purchase of Real Estate, whereby debtors agreed to purchase 129.3 acres which was identified as Tracts 1 through 5: Tract 1 (Steve's residence), Tract 2 (Steve's gravel pit), Tract 3 consisting of 17.306 acres, Tract 4 consisting of 17.306 acres and Tract 5 consisting of 12.853 acres. Albert's Estate and debtors agreed on a purchase price of $119,040.00 for the entire 129.3 acres and from the purchase price, debtors were given a credit for the inheritance Steve, Travis, Alicia and Andrea would have otherwise been entitled to and for funds debtors had already advanced to the Estate. However, debtors would still need approximately $41,404 to close the sale. Someone would need to obtain a loan for this amount. In addition, Steve, Travis, Alicia and Andrea would have to waive their respective inheritances of $36,863, $8,324, $8,324, and $8,324 (the values attributed to the parcels willed to them by Albert).

Although Steve had never had a loan in his own name, he explored financing for Tract 2 from friends and acquaintances (Kathleen Barnes and Vick Reichenbach). However, he did not follow through with his efforts, instead agreeing to waive his inheritance so debtors could procure financing to close the sale. Steve and debtors orally agreed that if Steve waived his

-5-

inheritance, debtors would purchase Tracts 1 through 5 and as soon as Steve repaid what he owed, Tracts 1 and 2 would be transferred to Steve. Consistent with their oral agreement, Steve waived his inheritance and debtors obtained a loan from Yellowstone Bank to complete the purchase of Tracts 1 through 5.

The sale closed on or about May 2, 2005. The settlement statement reflected a total purchase price of $119,040. In addition to the purchase price, debtors paid settlement charges of $687.00, property taxes of $3,609.74, and county taxes from May 2, 2005, to January 1, 2006, of $646.62. From the gross amount due of $123,983.36, debtors were given a $61,835.00 credit for the inheritances waived by Steve, Travis, Alicia and Andrea. Debtors were also given a credit of $15,801, representing funds previously advanced by debtors to keep Albert's Estate liquid during the probate period. The balance owed of $46,347.36 was paid with proceeds from a Yellowstone Bank loan.[5] The sum of the earnest money and the loan is $62,148.36, but of the foregoing amount, $3,609.74 was for property taxes owed on debtors' property. After subtracting the inheritance waivers and the property taxes, $58,538.62 of the total funds advanced were paid to purchase Tracts 1 through 5. Of the foregoing amount, $1,333.62 was attributable to settlement charges and county taxes, leaving funds due to the Estate of $57,205.00.

---

[5] The loan bore interest at 7.5% and called for 35 monthly payments of $429.75 with a balloon of $41,141.32 on May 1, 2008. Debtors gave Yellowstone Bank Tracts 1, 2, 3, 4 and 5 and their separate 20 acres as collateral for the $46,347.36 loan.

In 2007, debtors refinanced the Yellowstone Bank obligation, releasing all the real property collateral except their own 20 acres. Debtors then transferred Tracts 3, 4 and 5 to Alicia, Travis and Andrea. Debtors also formed TAA, LLC in February 2009. The Articles of Organization show Kevin and Alicia Remington as the members of TAA, LLC. Debtors transferred four of their acres, and Tracts 1 and 2 to TAA, LLC on or about February 24, 2010.

In February of 2011, TAA, LLC transferred Tract 1 to Steve.[6] At this same time, TAA, LLC transferred debtors' original 20 acres and Tract 2 back to debtors.

As previously noted, Steve's home is located on Tract 1. Steve temporarily left his property from August 2, 2010, to February 1, 2011, to attend an alcohol treatment program. Steve allowed a friend, Kenny, to stay at his home while Steve was away for treatment. Steve anticipated that Kenny would operate the gravel pit during Steve's absence. Debtors, however, would not allow Kenny access to Tract 2 and when Steve returned from treatment in February 2011, he discovered debtors had posted no trespassing signs and had installed chains across the gates on Tract 2. Steve contacted the sheriff, but was advised that he would have to consult with a civil attorney because title to Tract 2 was in debtors' name. Debtors have not allowed Steve to operate his gravel business since his return from alcohol treatment.

---

[6] Steve was entitled to Tract 1 free and clear as part of his inheritance. Aldora failed to explain why Tract 1 was not transferred to Steve any sooner.

Steve has a screener plant and other personal property located on Tract 2. Steve was advised by debtors' attorney in January 2012 that he could remove his personal property from Tract 2. However, given the time of the year, it was impossible for Steve to remove his personal property, including the screener plant, from Tract 2.

While Steve was away for alcohol treatment, debtors attempted to operate Steve's gravel business by holding themselves out as the new owners of Steve's business and identifying their daughter, Andrea Aldrich, as business manager. Debtors' efforts failed.

## The Bankruptcy Proceedings

On April 29, 2011, debtors filed their chapter 7 petition. Debtors listed Tract 2 in Schedule A. Debtors filed a homestead declaration for their entire 20 acres plus Tract 2.

### The Adversary Proceeding

On August 25, 2011, Steve commenced an adversary proceeding against debtors seeking to quiet title to Tract 2 and gain immediate possession of Tract 2. Steve also sought damages for conversion, fraud, breach of fiduciary duty and breach of contract. Steve alleged that he had a contract with debtors and that upon payment of a purchase price, they were to convey Tract 2 to him. On December 12, 2011, debtors answered the complaint and asserted affirmative defenses, including the statute of frauds. Pursuant to stipulation and an order, debtors filed an amended answer on February 6, 2012, asserting a statute of limitations defense to Steve's claims for fraud, breach of fiduciary duty, conversion and breach of oral

-8-

contract. That defense was based in part on a claim for adverse possession under 70-19-401, MCA.[7]

On April 26, 2012, the bankruptcy court conducted a trial. The court took the matter under advisement and on June 22, 2012, entered a Memorandum of Decision and Order finding in favor of Steve. The court found that there was an enforceable oral contract between the parties and that the balance owing on the contract was $27,956.25. The court entered judgment on the same day. Debtors appealed.

On October 29, 2012, the clerk's office issued an order regarding the Panel's jurisdiction over the claims for breach of fiduciary duty, fraud and punitive damages which were not ruled upon. On November 30, 2012, the bankruptcy court entered an amended judgment which dismissed those claims. Accordingly, the Panel issued an order finding that the finality problem had been cured.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A. Whether the bankruptcy court erred in finding an

---

[7] This statute states:

An action for the recovery of real property or for the possession of real property may not be maintained unless it appears that the plaintiff or the plaintiff's ancestor, predecessor, or grantor was seized or possessed of the property in question within 5 years before the commencement of the action.

-9-

enforceable oral contract between Steve and debtors for the sale of Tract 2;

B.   Whether the bankruptcy court erred in calculating the balance due from Steve to debtors for the purchase of Tract 2; and

C.   Whether the bankruptcy court erred in not awarding debtors ten percent interest on the balance due from Steve.

**IV.   STANDARDS OF REVIEW**

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. <u>Korneff v. Downey Reg'l Med. Ctr.-Hosp., Inc. (In re Downey Reg'l Med. Ctr.-Hosp., Inc.)</u>, 441 B.R. 120, 127-28 (9th Cir. BAP 2010).

A factual determination is clearly erroneous if the appellate court, after reviewing the record, has a definite and firm conviction that a mistake has been committed. <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 573 (1985).  Where there are two plausible views of the evidence, "the factfinder's choice between them cannot be clearly erroneous." <u>Id.</u> at 574. "A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record." <u>Retz v. Samson (In re Retz)</u>, 606 F.3d 1189, 1196 (9th Cir. 2010) (citing <u>United States v. Hinkson</u>, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009) (en banc).

**V.   DISCUSSION**

Montana law determines the parties' ownership interest in Tract 2. <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979). Debtors admit that there was an oral contract which required Steve to pay them for Tract 2.  Therefore, our discussion

-10-

focuses on the enforceability of the contract.

**A.    The Statute of Frauds**

Debtors first contend that the oral contract is unenforceable due to the statute of frauds.  The statute of frauds is codified in 28-2-903 and 70-20-101, MCA.  Pursuant to 28-2-903(1)(d), MCA, "an agreement for the leasing for a longer period than 1 year or for the sale of real property . . . is invalid unless the authority of the agent is in writing and subscribed by the party sought to be charged."  Additionally, 70-20-101, MCA, provides that an interest in real property may not be transferred unless there is an instrument in writing, subscribed by the party transferring it or by the party's lawful agent authorized by writing.  Hayes v. Hartelius, 697 P.2d 1349, 1353 (Mont. 1985).

Here, there is no dispute that the agreement between the parties was not in writing and therefore it could not be enforced under 28-2-903(d), MCA, and the bankruptcy court so found.  Debtors argue that "for this reason alone" there is no contract that Steve has a right to enforce.  We are not persuaded.

The Montana Supreme Court has held that the statute of frauds is inapplicable when the parties have admitted the existence of a contract.  Hayes, 697 P.2d at 1353.  The court reasoned that "it would be a fraud on the defendant to allow plaintiffs to admit to the contract, and then allow them to avoid its obligations by asserting the statute of frauds."  Id.; see also Hillstrom v. Gosnay, 614 P.2d 466, 470 (Mont. 1980) (stating that "in cases involving admitted contracts, we have

-11-

construed the statute of frauds less technically, refusing to allow the statute to be used so as to defeat its purpose to prevent the commission of a fraud."). Because Aldora testified that an oral agreement existed between the parties, debtors cannot now attempt to invoke the statute of frauds to deny the existence of such an agreement. <u>Hayes</u>, 697 P.2d at 1353.

Additional factors also defeat debtors' statute of frauds defense. Debtors acknowledge that partial performance may take an oral contract outside the statute of frauds. The statute of frauds does not abridge the power of any court to compel the specific performance of an agreement, in case of partial performance of the agreement. 70-20-102(3), MCA; <u>Hayes</u>, 697 P.2d 1349 (Mont. 1985). The sufficiency of acts to constitute part performance can be decided as a matter of law. <u>Quirin v. Weinberg</u>, 830 P.2d 537, 541 (Mont. 1992) (citing <u>Schwedes v. Romain</u>, 587 P.2d 388, 391 (1978)). For an act to be sufficient to constitute part performance, it "must be unequivocally referable to the contract." <u>Quirin</u>, 830 P.2d at 541 (quoting <u>Schwedes</u>, 587 P.2d at 391). In addition, "a court has the power to compel the specific performance of one party to an oral contract for the sale of real property in the case of part-performance by the other party." <u>Luloff v. Blackburn</u>, 906 P.2d 189, 191 (Mont. 1995).

Debtors ignore this settled case law and fail to specify on appeal why they think that the bankruptcy court erred in finding that Steve's payments to debtors of over $12,000 constituted partial performance of the oral contract. Issues not specifically raised and argued in a party's opening brief are

-12-

waived. <u>Martinez-Serrano v. INS</u>, 94 F.3d 1256, 1259-60 (9th Cir. 1996). Because the record supports the bankruptcy court's finding that Steve partially performed the oral contract, we conclude the court properly found that the contract was outside the statute of frauds.[8] As a result, debtors' assignment of error on the statute of frauds ground fails.

**B.    Termination of the Contract for Nonpayment**

Debtors next contend that they terminated the contract because Steve stopped making payments to them in August 2008 despite their repeated demands. Debtors  argue that because Steve had a duty to make regular monthly payments on this obligation and did not make any for over four years, by law this contract should have been deemed to have terminated.

To support their argument, debtors cite Montana case law that sets forth two rules. "When the purchase price of property under a contract for deed is paid in installments, 'default in the payment of any installment is a distinct breach and gives the vendor the right to declare a forfeiture.'" <u>Liddle v. Petty</u>, 816 P.2d 1066, 1069-70 (Mont. 1991). Debtors also argue that "[i]f a contracting party materially breaches the contract, the injured party is entitled to suspend his performance, and the determination of whether a material breach exists is a question of fact." <u>Sjoberg v. Kravki</u>, 759 P.2d 966, 969 (Mont. 1988). Debtors contend that the facts showed that Steve failed to make the payments he was required to make and, therefore,

---

[8] The record shows that Aldora gave Steve credit for some of the payments he made to debtors towards the purchase.

-13-

there was a material breach of the oral contract. Accordingly, debtors maintain they have no further obligation to convey title to Tract 2 to Steve.

The rules in Liddel and Sjoberg have no application under the facts developed at trial. Steve's testimony shows that he was willing to tender performance, but debtors never told him how much he owed. They then refused his payments and declared Tract 2 as part of their homestead so it would be protected when they filed bankruptcy.

The bankruptcy court found that debtors never told Steve he was in default under the oral agreement. Yet, debtors contend on appeal that they took "appropriate action" to terminate the contract when Steve failed to make the payments. Without citation to the record, they argue that they made a demand on Steve to cure his arrearage and that he was given sufficient notice to do so.

We have combed the record, but find no evidence to support debtors' contentions. When asked whether she ever told Steve that he was in default, Aldora testified "I don't recall at this moment whether I specifically said 'you are in default.'" She further testified that she never sent Steve a default notice. Aldora later stated that although Tract 1 and 2 were transferred to TAA, LLC in 2010, if Steve "would have made up the payments and caught them up and paid off the original Yellowstone Bank loan" he could have gotten the property back. When asked whether she told Steve how much he owed at that point, she said: "I did not know how much he owed because he was already in arrears with everything."

-14-

Moreover, the record shows that Steve attempted to tender payment, which debtors refused. Steve testified that he offered debtors a complete payoff for the property and they wouldn't take it. Steve also stated that debtors would not take any further payments from him because they were going to file bankruptcy. At one point, Aldora testified that she asked Steve to make additional payments "many times" in 2007 and 2008. However, Aldora later admitted that she did tell Steve she could not take any more money from him because debtors were filing bankruptcy. Steve's friend, Rick Althoff, testified that sometime after Steve returned from the alcohol treatment center, Rick spoke to John about working something out for a payoff. Rick said that John responded "no." This testimony was uncontroverted.

Given this testimony, the bankruptcy court reasonably could have concluded that the oral contract was not terminated or forfeited due to debtors' failure to give Steve notice of the alleged default coupled with Steve's good faith attempt to tender payment, which debtors refused. Further, by imposing a constructive trust over the property, the bankruptcy court implicitly found that a forfeiture would result in unjust enrichment to debtors due to Steve's partial performance. Debtors have not pointed to, nor have we found, any facts in the record at variance with the bankruptcy court's findings. Given the absence of such evidence, the bankruptcy court's interpretation of the facts was not implausible on its face. For these reasons, debtors' termination of contract argument fails.

-15-

**C.    Adverse Possession Claim**

Debtors next contend that they obtained title to Tract 2 by adverse possession.  Because they paid all the real estate taxes since 2005, debtors argue that Steve has no right to a claim or interest in the property as a matter of law.

The bankruptcy court did not rule on debtors' adverse possession claim[9] and nowhere in the trial was the issue of adverse possession raised.  We need not consider arguments raised for the first time on appeal.  <u>See</u> <u>Brown v. Gen. Tel. Co. of Cal.</u>, 108 F.3d 208, 210 n.1 (9th Cir. 1997) (per curiam).

However, if we address this argument, it fails.  The record does not support a claim for adverse possession.  Under Montana law, the party asserting a claim for adverse possession must prove each element by clear and convincing evidence.  <u>Wareing v. Schreckendgust</u>, 930 P.2d 37, 43 (Mont. 1996).  In addition to paying the taxes, the claimant must show use that is open, notorious, exclusive, adverse, continuous, and uninterrupted for the statutory five-year period.  <u>Burlingame v. Marjerrison</u>, 665 P.2d 1136, 1139 (Mont. 1983).  Here, the testimony of the parties shows that Steve had use and possession of Tract 2 until debtors locked him out in the summer of 2010 when he left the property for alcohol treatment.  Steve commenced the adversary proceeding against debtors to quiet title to Tract 2 on August 25, 2011.  On these facts, debtors have not shown their open, notorious, exclusive, adverse, continuous, and

---

[9] Debtors did raise adverse possession in connection with their statute of limitation defense in their amended answer.

-16-

uninterrupted use for the statutory five-year period by clear and convincing evidence. Debtors' adverse possession claim thus fails as a matter of law.

**D. Amount Owed by Steve**

Debtors contend that the bankruptcy court abused its discretion when it determined the amount Steve needed to pay to debtors before transferring Tract 2 to Steve. Debtors maintain that the court erred in determining the amount of principal owed and the amount of credit given for payments made by Steve.

The bankruptcy court's Memorandum of Decision includes extensive factual findings supporting its calculation of the amount owed: (1) the parties had a contract, but they never discussed the exact amount Steve would need to pay in order to secure title to the property nor did they discuss a repayment plan; (2) Steve testified that he understood he could make payments to Aldora as he had funds available; (3) Steve did not keep accounting records and Aldora was, to some extent, in charge of Steve's records; (4) Aldora did not have a complete accounting of the bills she allegedly paid on Steve's behalf; (5) Steve testified that he thought he owed $35,000 to debtors; and (6) Aldora testified that the sole purpose of the Yellowstone Bank loan was to allow Steve to purchase Tracts 1 and 2.

On this last point, the bankruptcy court found that the evidence did not necessarily support Aldora's testimony. The court determined that debtors' primary motive when they entered into the Contract for the Sale and Purchase of Real Estate with Albert's Estate was to secure title to Tracts 3 and 4 and

preclude Gabel Construction from purchasing this land. The bankruptcy court supported its finding by reference to the Contract for the Sale and Purchase of Real Estate, which specifically referred to Tracts 1 through 5, and the settlement statement. The court concluded that although debtors had advanced $15,801 to the Estate, they could not have secured Tracts 3 and 4 without obtaining the loan from Yellowstone Bank because their deal with the Estate was an all or nothing deal that tied Tracts 3 and 4 to the purchase of Tracts 1 and 2.

Based on this evidence, the bankruptcy court concluded that Steve was originally obligated to pay debtors $39,293.42 plus property taxes of $1307.82 for a total of $40,601.25.[10] The court further found that Steve was entitled to a credit of $12,645 based on payments made as shown in Exhibit S. Accordingly, the court concluded that the total owed by Steve to debtors for the purchase of Tract 2 was $27,956.25.

The bankruptcy court thoroughly considered the relevant evidence and issued detailed findings of fact based on this evidence. On appeal, rather than show how the evidence fails to support the bankruptcy court's factual findings, debtors simply reargue the facts of the case to convince us they should have prevailed. This is not an appellate function. It is debtors' burden to point out where the findings are clearly erroneous.

---

[10] The court calculated the $39,293.42 amount by taking 43.009 acres x $913.61 per acre. The 43.009 number represents the acreage over and above which Steve would have received free and clear under Albert's Will. The court arrived at the $913.61 per acre by dividing $58,538.62 (the amount debtors' paid the Estate at closing) by Steve's excess acreage (43.009) and debtors' children's excess acreage (21.065).

-18-

> An appellant's mere challenge of a finding does not cast the onus of justifying it on this court. The party seeking to overthrow findings has the burden of pointing out specifically wherein the findings are clearly erroneous. Appellant has not carried the burden as to any particular challenged finding sufficiently to require or justify a detailed analysis of the evidence. . . .

Glen Falls Indem. Co. v. United States, 229 F.2d 370, 373 (9th Cir. 1955).

Debtors have not carried their burden to show specifically where the bankruptcy court clearly erred. Nothing more is required of us than to compare the bankruptcy court's findings to the record to see if they are clearly erroneous. See id. We conclude they are not. Where there are two plausible views of the evidence, "the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

**E.    Interest on the Amount Owed**

Last, debtors contend that the bankruptcy court erred by not awarding them interest on the amount owed by Steve. We review de novo whether an award of interest is authorized under state law. See Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co., 513 F.3d 949, 954 (9th Cir. 2008).

Debtors argue that they are entitled to ten percent interest based on 31-1-106, MCA, which provides the legal interest rate for breach of contract:

> (1) Except as otherwise provided by the Uniform Commercial Code, 31-1-111 and 31-1-112, or 31-1-817, unless there is an express contract in writing fixing a different rate or a law or ordinance or resolution of a public body fixing a different rate on its obligations, interest is payable on all money at the rate of 10% a year after it becomes due on:
> . . .

-19-

(b) an account stated;

(c) money lent or due on any settlement of accounts from the date on which the balance is ascertained
. . . .

Debtors fail to show they qualify for interest under this statute. First, subsection (b) is inapplicable. An "account stated" is a final adjustment of demands and amounts due. Holmes v. Potts, 319 P.2d 232, 238 (Mont. 1957).

'An account stated presupposes an absolute acknowledgment or admission of a certain sum due, or an adjustment of accounts between the parties, the striking of a balance, and an assent, express or implied, to the correctness of the balance. If the acknowledgment or admission is qualified, and not absolute there is no account stated.' Id.

See also Nelson v. Mont. Iron Mining Co., 371 P.2d 874, 876 (Mont. 1962). There was no account stated in this case.

Second, subsection (c) does not apply under these facts. Black's Dictionary defines a "loan" as "1. An act of lending; a grant of something for temporary use - Turner gave the laptop as a loan, not a gift. 2. A thing lent for the borrower's temporary use; esp., a sum of money lent at interest - Hull applied for a car loan." The record does not show that debtors made a loan to Steve. Further, there was no money due on any "settlement of accounts from the date on which the balance is ascertained." Debtors never made a demand on Steve, never gave him notice of default, and never did the parties agree on the amount Steve was to pay. Ultimately, it was up to the bankruptcy court to decide that there was an oral contract, liquidate the claim and enter judgment. We conclude that debtors were not entitled to interest under 31-1-106, MCA.

We also examined 27-1-211, MCA, entitled "Right to

-20-

interest," which states:

> Each person who is entitled to recover damages certain or capable of being made certain by calculation and the right to recover that is vested in the person upon a particular day is entitled also to recover interest on the damages from that day except during the time that the debtor is prevented by law <u>or by the act of the creditor from paying the debt</u>. (Emphasis added.)

By its terms, this statute applies to any conduct by the creditor that prevents the debtor from complying with his or her obligation to pay.

The case of <u>Kosena v. Eck</u>, 635 P.2d 1287 (Mont. 1981) illustrates the point. There, the landlords refused to accept the tenant's monthly rent payment. Because of their refusal, the tenant had no choice but to file a lawsuit and tender the monthly rent payment into court. The trial court awarded the landlords interest on rental payments due from the tenant at the rate of six percent per annum from the due date of each payment as rent on the premises. The Montana Supreme Court reversed, finding that 27-1-211, MCA, clearly released the tenant from any obligation to pay interest:

> Because the landlords were entitled to no more than $650 per month, it was their own refusal to accept the tendered payment, which resulted in the tenant filing a lawsuit and prevented them from receiving each payment as it became due. By any standards, the conduct of the landlords prevented the tenant from making the required payments. The tenant should not be penalized for attempting to comply with the terms of the lease agreement, nor should the landlords be rewarded for unjustifiably refusing to accept the payments. The order allowing interest is reversed.

For the same reasons, debtors' argument for an award of interest at the contract rate of ten percent from 2005 is flawed. The record shows they contributed to Steve's delay in the payment of the funds. After Steve partially performed,

-21-

debtors refused to tell him how much he owed. They also told him not to pay since they were filing bankruptcy and, when Steve attempted a complete payoff for the property, they wouldn't take it. Therefore, Steve's tender was excused and the payment of interest, if any, was suspended. See Sunray DX Oil Co. v. Great Lakes Carbon Corp., 476 P.2d 329, 344 (Okl. 1970) (a party cannot act in a manner which will tend to cause the other party to default under a contract and benefit therefrom).

Finally, interest as an element of damages is not allowable until the exact amount due is ascertained or is ascertainable. In re Marriage of Gerhart, 800 P.2d 698, 701 (Mont. 1990). "Liquidated claims" include indebtedness which is capable of ascertainment by reference to agreement or simple mathematical computation. Kelleher Law Office v. State Compensation Ins. Fund, 691 P.2d 823, 826 (Mont. 1984). Here, there is no agreement to refer to. Further, Aldora admitted that she did not know how much Steve owed and there was a dispute between the parties as to the exact amount. Therefore, the bankruptcy court had to liquidate the claim and enter judgment. Under these circumstances, at best, debtors would be entitled to interest at the ten percent rate only from the date of the judgment until Steve paid over the funds. See Callihan v. Burlington N. Inc., 654 P.2d 972, 977 (Mont. 1982) (statute governing right to interest allows interest only from date of judgment, as that is date damages are capable of being made certain).

In sum, we conclude that the relevant Montana statutory and case law does not support an award of interest when debtors refused to take Steve's payments and on a contract that debtors

-22-

claimed did not exist. Accordingly, we find no error with the bankruptcy court's decision not to award interest on the amount owed by Steve to debtors.

### VI. CONCLUSION

For the reasons stated, we AFFIRM.